[No. D024406. Fourth Dist., Div. One. Nov. 27, 1996.]

RICK SHACKET, Plaintiff and Respondent, v.
OSTEOPATHIC MEDICAL BOARD OF CALIFORNIA, Defendant and
Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of part III.

## COUNSEL

Daniel E. Lungren, Attorney General, Anthony M. Summers and Susan A. Ruff, Deputy Attorneys General, for Defendant and Appellant.

David B. Norris for Plaintiff and Respondent.

## OPINION

**WORK, J.**—The Osteopathic Medical Board of California (Board) appeals a judgment issuing a writ of mandate pursuant to Code of Civil Procedure section 1085 directing it to not release or otherwise disseminate a report submitted by the San Diego Foundation for Medical Care (FMC) purported to be prepared pursuant to Business and Professions Code[2] section 805. Although it is FMC's status Rick Shacket challenges, he never made FMC a party to this action.

The procedural setting of this case raises the institutional issue of the scope of the Board's statutory responsibility to confirm a reporting entity is in fact a "peer review body" within the meaning of section 805, while we also review the underlying facts to determine whether the trial court's determination FMC did not constitute a peer review body is supported by the record. As we shall explain, we conclude the Board need only confirm on a prima facie showing the reporting entity is a peer review body as defined in section 805 before disseminating a section 805 report, and the record is insufficient to support the trial court's determination FMC does not constitute a peer review body within the meaning of section 805, subdivision (a)(1)(D). Accordingly, we reverse the judgment.

I

*Factual and Procedural Background*

Shacket is an osteopathic physician, licensed to practice by the Board and was formerly a member of FMC. The Board is responsible for the licensing

---

[2]All statutory references are to the Business and Professions Code unless otherwise specified.

and monitoring of osteopathic physicians, as well as instituting its own disciplinary action under section 2234. At all applicable times, FMC was a private nonprofit mutual benefit corporation, established for the specific and primary purposes of: "[p]romot[ing] the social welfare of its members, and those persons served by its members, by promoting a mechanism for the fair, just and expeditious processing and payment of medical bills for services rendered by physicians and other supporting professionals and organizations, by its sponsorship and administration of health plans which provide fair and just coverage and benefit levels, by promoting and sponsoring review procedures concerning medical fees, by developing educational programs designed to disseminate information covering health delivery techniques and systems to members and other interested persons." FMC's articles of incorporation expressly limit the corporation's authorization in any substantial degree to engage in any activities or exercise any powers which do not further its declared specific and primary purposes. Upon joining FMC, Shacket received a copy of the restated articles of incorporation and claims to have been advised peer review was limited to reviewing his claims for fees. He believed FMC was organized solely to standardize fees so collection from insurers and preferred provider organizations would be more facile for its members.

On January 6, 1994, Shacket was requested to meet with FMC's surgery liaison committee, to discuss six of his claims which "appeared, upon initial review, to fall outside of the expected community norms, . . . on an informal, physician-to-physician basis." At that meeting, FMC denied Shacket's requests that two allopathic doctors be removed and that an osteopathic doctor be added to the reviewing panel. Shacket claims he understood the only issues FMC would be discussing were the amount of the fees and the method of billing.

By letter dated May 18, Shacket resigned from FMC effective immediately, citing a dispute between the Osteopathic Society and FMC. By letter dated May 19, FMC suspended Shacket's membership, stating:

"Based upon information available to the San Diego Foundation for Medical Care, the decision has been reached, in the interest of patient safety or the delivery of patient care and for other reasons, to summarily suspend your membership in the Foundation and your participation on our PPO panel, effective immediately.

"In accordance with the Foundation's Corrective Action and Fair Hearing Procedures, this matter has been referred to the Membership Committee for further review. The Membership Committee is required to recommend further action or to reinstate your membership within thirty (30) days." Four

days later, Shacket wrote FMC, expressing his disagreement with the committee's decision; declaring he did not believe the committee had all the facts; contending local politics had denied him a fair review; emphasizing he was denied a fair composition of committee members given the denial of his requests for another osteopathic proctologist to serve on the committee and that a specific colon and rectal surgeon he described as a fierce competitor be removed from the committee; confirming his prior resignation from FMC; and objecting to the committee's decision and the inherent conflict of interest within it.

On June 22, FMC sent to the Board a document entitled, "Report Under Section 805 of the California Business and Professions Code Concerning Rick A. Shacket, D.O." The report stated:

"The San Diego Foundation for Medical Care ('Foundation') is a non-profit physician-sponsored organization which provides peer review for its members. As such, we believe that we are a 'peer review body' as defined by section 805 of the California Business and Professions Code. In accordance therewith, we are hereby reporting that the Foundation summarily suspended the membership of Doctor Rick A. Shacket, based on a medical disciplinary cause or reason, for a thirty (30) day period effective May 19, 1994. This suspension followed a meeting with Doctor Shacket and our Surgical Liaison Committee on March 24, 1994, where he was given the opportunity to respond to concerns of his medical practices which are summarized below.

"Thereafter, Doctor Shacket informed us that he elected to resign from the Foundation, effective immediately, by letter dated May 18, 1994, but post-marked May 24, 1994. The Foundation received this letter on May 26, 1994, and accepted Doctor Shacket's resignation as of that date. Notwithstanding Doctor Shacket's resignation, the Foundation further believes that it must file this report because of his knowledge of the investigation into his medical practice then pending.

"Based on an ongoing review of Doctor Shacket's claims over the last year, it was determined that his medical practice deviated from peer review norms and the standards generally accepted in the community. In particular, the Foundation had concerns with respect to a number of his patients returning for additional surgery similar in nature to the initial procedures performed on them. The Foundation also had concerns about the types and multiplicity of other procedures performed on each patient, possible misrepresentations in the billing of anesthesia services and the unbundling of both surgical procedures and post-surgical follow-up care. The safety of administering IV sedation without the availability of an EKG monitor was also a concern.

"These concerns raised significant unresolved quality of care and judgment issues in addition to questions about improper billing with respect to Doctor Shacket's medical practice. The Foundation believes that these concerns relate to Doctor Shacket's competency or professional conduct which is reasonably likely to be detrimental to patient safety or the delivery of patient care, hence warranting a report pursuant to section 805 of the California Business and Professions Code."

After receiving the FMC report, the Board on August 9 requested FMC forward the files of those patients which resulted in the report. They were received by the Board from FMC on September 2.[3] The FMC report, accompanied by the forwarded files, were reviewed by three consultants, each of whom is a California-licensed osteopathic physician. They concluded the FMC report had merit. On November 1, the Board advised Shacket its consultants' committee had met in special session and concluded the report had merit. He was advised the file would be retained for three years and that although it did not constitute a public document, it would be disclosed to all hospitals seeking verification of his license.

Following discussions and correspondence between Shacket's counsel and the Board, the Board advised the former it had:

". . . reevaluated the 805 Report submitted by Foundation for Medical Care (FMC) and determined it is a type of reportable peer review.

"Therefore, if you disagree, you must resolve the matter with FMC as we have no authority to question who reports an 805; we can only review those 805's received and determine if there is merit or not."

On May 10, Shacket petitioned for writ of mandamus, writ of administrative mandamus, and an injunction to prevent the Board from disseminating the FMC report unless it is first judicially determined FMC is a peer review body within the meaning of section 805, subdivision (a). He asked the court to rule whether FMC's peer review committee was established for the purpose of reviewing the quality of professional care and whether Shacket's suspension or resignation from FMC constituted a denial of staff or medical privileges under section 805.5. In addition, Shacket sought to have the Board directed to provide him due process rights in its determination of whether the section 805 report is proper and meritful. The court issued a preliminary injunction enjoining the Board from disseminating the report and, following

---

[3]Shacket asserts FMC had no access to his patient files, arguing it must have forwarded only his claims for fees and the necessary support documentation. He provides no evidentiary support for this contention.

a hearing, granted Shacket's petition for writ of mandate pursuant to Code of Civil Procedure section 1085. The court reasoned in both its minute order of July 14 and its statement of decision filed on August 7: "Since the San Diego Foundation for Medical Care ('FMC') is not a 'peer review body' as defined in B.&P.C. § 805, whether petitioner exhausted his administrative remedies with the FMC is irrelevant. FMC is not an indispensable party to this proceeding as the court's decision does not require the FMC to do or to refrain from doing anything. Rather, the court is only ordering the Board not to release the purported '805 Report' submitted by FMC. Nor is the court requiring the Board to conduct hearings prior to accepting or disseminating 805 Reports."

II

*The Board Must Confirm on a Prima Facie Showing a Reporting Entity Is a Peer Review Body as Defined in Section 805 Before Disseminating a Section 805 Report*

■ We first address the Board's request for guidance regarding the scope of its procedural responsibilities under sections 805 and 805.5, and specifically whether it must determine if a reporting entity is a peer review body or a health care facility or clinic as defined under section 805 before disseminating a section 805 report. We conclude the statutory scheme requires the Board to confirm, by a prima facie showing, the reporting entity is a peer review body as defined in section 805 before disseminating a section 805 report.

The governing statutory scheme here, sections 800-809.6, sets forth a comprehensive, professional reporting scheme for licensing agencies. Each respective board separately creates and maintains a central index of all persons holding a license, certificate or similar authority from such board. (§ 800, subd. (a).) Each central file provides an individual historical record for each licensee, including reports made to the licensing agencies of settlements or arbitration awards (§§ 801-802), public complaints (§ 800, subd. (b)), civil judgments and criminal charges and convictions (§§ 803, 803.5), and discipline by peer review bodies (§ 805). (§ 800, subd. (a).)

As to peer review, the Legislature explicitly states in section 809 that peer review, fairly conducted, will assist licensing agencies in regulating and disciplining errant healing arts practitioners, as well as protecting the health and welfare of the people of California by excluding healing arts practitioners who provide substandard care or who engage in misconduct. (§ 809, subd. (a)(5), (6).) Section 805 implements the legislative intent regarding

peer review bodies by defining them and requiring them to report suspension of a licentiate's membership for a medical disciplinary cause or reason. (§ 805, subd. (b).) A medical disciplinary cause or reason "means that aspect of a licentiate's competence or professional conduct which is reasonably likely to be detrimental to patient safety or to the delivery of patient care." (§ 805, subd. (a)(6).) Of relevance here, section 805, subdivision (b)(3) requires the reporting of a resignation following notice of an impending investigation. The Board is required to disclose section 805 reports as required by section 805.5 (§ 805, subd. (d)) and to maintain them three years after receipt for dissemination (§ 805, subd. (e)). Under section 805.5, institutions which grant staff privileges to physicians are required to inquire as to the existence of section 805 reports and the Board is required to furnish copies of such reports unless "(1) . . . the denial, removal, or restriction was imposed solely because of the failure to complete medical records, (2) . . . the [B]oard has found the information reported is without merit, or (3) . . . a period of three years has elapsed since the report was submitted." (§ 805.5, subd. (b).)

This statutory scheme places upon the licensing board the responsibility for verifying a reporting entity claiming to be a peer review body within the meaning of section 805, subdivision (a)(1), meets the statutory qualifications. The Board may distribute upon request only section 805 reports which are not statutorily stale, do not simply involve the failure to complete medical records and *have merit*. Because the Board must determine the merit of a section 805 report before dissemination (§ 805.5, subd. (b)) and given the express legislative findings endorsing peer review *fairly conducted* in accordance with state law (§ 809), it is clear the Board is not authorized to distribute a purported section 805 report completed by an entity which is not a peer review body as defined by section 805. Accordingly, the Board must confirm the reporting entity has made a prima facie showing it is a peer review body as defined in section 805. A "prima facie showing" under these circumstances consists of sufficient documentary evidence which, if uncontradicted, raises a reasonable inference the entity is a peer review body as defined in section 805, subdivision (a)(1). (See *Evans* v. *Paye* (1995) 32 Cal.App.4th 265, 280-281, fn. 13 [37 Cal.Rptr.2d 915]; Black's Law Dict. (6th ed. 1990) pp. 1189-1190; The American Heritage Dict. (1976) p. 1039, col. 2.) For instance, such a showing may be made by the reporting entity in its section 805 report specifying the statutory basis under which it qualifies as a peer review body. Once a submitting authority has made a prima facie showing it is such a peer review body, the Board's duty to inquire as to this issue ends. It follows, therefore, the Board may not furnish the reporting entity's report to requesting institutions absent such a prima facie showing.

■ The trial court correctly ruled the Board is not required to provide licentiates a hearing on challenges to the reporting entity's status as a

statutorily defined peer review body, or whether the section 805 report has merit, before disseminating the report. Given the comprehensive character of the legislative scheme, it is indeed understandable why such a hearing is not required. The Legislature envisioned a process integrating the private and public systems of peer review for providers of health care services. (Stats. 1987, ch. 1044, § 1, p. 3535.) It delegated to the private sector the responsibility to provide fairly conducted peer review in accordance with the notice, discovery and hearing rights of due process. (§§ 809.1-809.6.) At the same time, the Legislature delegated to the Board the responsibilities of creating and maintaining the historical files of licensees; being the repository of statutorily specified historical public and private information (§§ 800-805); disseminating section 805 peer review reports which it deems to have merit and are not stale in accordance with section 805.5; and carrying out its own disciplinary action as the state licensing agency.

As to the peer review conducted by the private sector, licentiates are afforded procedural administrative safeguards inherent in the entity's adopted peer review process, following exhaustion of which they may obtain judicial review under Code of Civil Procedure section 1094.5. (§ 809.8.) Consequently, the Legislature relied upon the peer review bodies, subject to a licentiate's right to due process and judicial review, to discipline its members and report that discipline to the Board as the licensing agency. The Board then is mandated to make those reports available in response to legitimate inquiries according to the statutory scheme. Before disseminating a section 805 report, the Board need only confirm on a prima facie showing the reporting entity is a peer review body as defined in section 805, subdivision (a)(1), and the section 805 report has merit. The statutory scheme provides a licentiate with ample opportunity to contest the merit of the underlying accusations before a peer review body, including direct judicial challenges to that entity contesting the adequacy of its procedural due process on review, the sufficiency of the evidence underlying that body's findings, and whether, in fact, the reporting body is one defined in section 805, subdivision (a)(1). No additional hearing is required to be held by the Board before accepting or disseminating a section 805 report.[4]

---

[4]Although the Board is not required to hold a formal hearing before filing and disseminating a section 805 report, the Board is required, as we have explained, to confirm the merit of the report. For example, here, the Board received a document from FMC asserting it was a peer review body filing a report pursuant to section 805. The Board sought and obtained the patient records which resulted in the filing of the report. (§ 805.1.) These records were then reviewed by three licensed osteopathic physicians who acted as consultants to the Board. They concluded the report had merit and Shacket was notified of that determination and advised the report would be filed and made available to hospitals seeking to verify his license status. The foregoing process satisfied the Board's statutory obligations of performing an

# III

### Substantial Evidence Does Not Support the Trial Court's Determination FMC Is Not a Peer Review Body as Defined in Section 805, Subdivision (a)(1)(D)*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION[6]

The judgment is reversed.

Kremer, P. J., and Huffman, J., concurred.

A petition for a rehearing was denied December 16, 1996, and respondent's petition for review by the Supreme Court was denied March 26, 1997.

---

independent expert review of the documents underlying a section 805 report. Once it did so and determined the report was meritorious, it became obligated to comply with the statutory mandate to furnish the report upon legitimate request.

*See footnote 1, *ante*, page 223.

[6]Given our determination the record is insufficient to support the trial court's determination FMC is not a peer review body within the meaning of section 805, subdivision (a)(1)(D), we need not address the Board's remaining contentions regarding procedure.