[No. F037760. Fifth Dist. Nov. 1, 2001.]

UNNAMED PHYSICIAN,* Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF SAINT AGNES MEDICAL CENTER et al.,
Defendants and Respondents.

*Because of the sensitive nature of the allegations made by the hospital and the pendency of the internal peer review process, we deem it necessary to protect the physician's professional reputation at this juncture and will refer to him in this opinion as an unnamed physician, or appellant.

608

**COUNSEL**

Law Offices of Daniel O. Jamison and Daniel O. Jamison for Petitioner and Appellant.

S. A. Hansen & Associates, Stephen A. Hansen; Emerich, Pedreira & Fike and David R. Emerich for Defendants and Respondents.

**OPINION**

**ARDAIZ, P. J.**—Appellant is an unnamed physician licensed to practice medicine in California and has a board certified specialty. He has been a

member of the medical staff at Saint Agnes Medical Center,[1] a nonprofit public benefit corporation since 1992, and has full privileges at the hospital.

In 2000, based on a report initiated by a reappointment survey program, which indicated appellant's infection rate as being significantly higher than that of other physicians with his specialty, several of appellant's charts were flagged for peer review.[2] Thereafter, appellant's medical practices were reviewed by both an internal and external reviewer. The external reviewer, also with the same specialty, had no connection to appellant or respondents. Both reviews reported problems with appellant's medical practices.

The external reviewer, Dr. Raymond Berg, reported that each of the charts he reviewed "demonstrated some type of situation which might be deemed a quality of care issue. Foremost among these is an apparent excessive number of postoperative infections." Dr. Berg stated he would eliminate three cases from the fifteen he had considered as having a quality of care issue which could be attributed to the physician. He then stated his conclusions as follows: "There is a pattern in this [physician's] operative technique which is detrimental to good patient care. Whether it be lack of attention to sterile technique or careful attention to hemostasis the result is that an unusual number of patients have had disastrous outcomes from apparently well intentioned surgery. As such, the present situation should not continue and some changes should be made. This is to benefit not only the patient or hospital but to the [physician] himself. No physician should have to contend with the extra ordeal of dealing with so many serious complications, and he would benefit himself greatly in making these changes. [¶] Based upon the information provided to me in the above case reviews there is sufficient concern about patient outcomes and the surgical management and judgement of this practitioner to warrant a reduction or removal of staff privileges."

On July 12, 2000, after considering the reports of both reviewers and meeting with appellant, the surgery department requested an investigation of appellant's medical practices by the medical executive committee of the

---

[1]Those named in the petition as respondents include Saint Agnes Medical Center, the board of trustees of the medical center, the individual trustees, the medical executive committee of the medical staff and the individual committee members and the medical staff itself. Because their interests and positions on appeal are identical, we will refer to all collectively as respondents unless otherwise noted.

[2]For the period of January 1, 1999, to September 30, 1999, appellant had a 14 percent infection rate for one procedure and a 7.9 percent overall infection rate. This is apparently quadruple the national rate for physicians with his specialty.

medical staff[3] (MEC). On July 18, 2000, the MEC proposed a recommended corrective action which would severely limit appellant's privileges at Saint Agnes. On July 19, 2000, the MEC provided notice to appellant of the proposed action. The proposed action included the following restrictions:

"(1) All surgical cases must have a second opinion by [a physician with the same or similar specialty] who performs similar cases in his/her own practice and must be approved by the Department of Surgery;

"(2) You must be assisted by a [physician with the same or similar specialty] as appropriate to the case;

"(3) You must make rounds on a daily basis and see patients in the hospital as per the Bylaws;

"(4) You must meet with and hear advice from the Infectious Disease consultant and formulate a plan for corrective action;

"(5) Exercise of your privileges shall be subject to an on-going monitoring process that includes retrospective review of all surgeries with chart review as assigned by the Chairman of the Department of Surgery, and after twenty (20) cases, the data will be reassessed."

Attached to the notice of proposed action was a document entitled "Reasons for Action" which provided as follows: "1. The Member's conduct or acts, including a pattern of conduct, where detrimental to the delivery of quality patient care within the Hospital and/or below applicable professional standards and/or contrary to Medical Staff Bylaws and/or Rules and Regulations to the extent that restrictions on privileges are necessary."

The document also contained a summary of 22 patient admissions involving 16 different patients. The summaries, although containing information concerning infections and charting deficiencies, did not contain a clear statement identifying the "acts and omissions" charged against appellant. The document further included a two-page statistical summary entitled "Reappointment Summary" and "Reappointment Profile" without explanation of the significance of the data or the method used to obtain and evaluate it.

Within 30 days of the notice, appellant requested a hearing pursuant to section 7.3-2 of the bylaws of the Medical Staff of Saint Agnes Medical

---

[3]Respondents note that the medical staff of Saint Agnes Medical Center is not a separate legal entity and is thus improperly named as a defendant.

Center (bylaws). On September 1, 2000, respondents notified appellant of the date, time and place set for a hearing before the judicial review committee (JRC), an administrative review committee convened pursuant to section 7.3-5 of the bylaws. In accordance with section 7.4-1 of the bylaws, numerous prehearing matters were determined by the hearing officer, including recusal of the first selected hearing officer and reappointment of a second, various challenges by appellant to the notice given, and matters relating to appellant's entitlement to certain documents related to the proceedings.

Prior to the hearing, appellant asked respondents to drop the charges, claiming they lacked specificity and thus provided legally insufficient notice. Although the request was denied, respondents provided a document entitled "Supplemental Information Concerning Charges," dated October 24, 2000, which stated that appellant's "acts and omissions caused complications and infections through either poor surgical technique or poor preoperative assessment or poor post-operative management, . . . ." The letter referenced an additional two charts stating that during the peer review, these charts "received significant negative scoring during the 'quality improvement' process and, therefore, add to the negative pattern of conduct at issue." Appellant renewed his request that the charges be dismissed before the hearing officer on numerous grounds to no avail.

After appellant's prehearing challenges were decided in favor of respondent, appellant filed a petition for writ of mandate in Fresno County Superior Court on March 15, 2001, seeking review of the hearing officer's determination of the pretrial matters and a stay of the JRC hearing. The writ was denied on March 15, 2001. On March 16, the trial court refused to order the record sealed, but did order it sealed until determination of the issue by the appellate court.

On March 20, 2001, appellant petitioned this court for a writ of supersedeas seeking review of the trial court's order and requesting a stay of the proceedings. The petition was denied on March 28, 2001. On April 2, 2001, appellant filed a second petition seeking identical relief. The petition was denied on the same day. Appellant then sought review by the California Supreme Court. Review was denied on April 17, 2001.

On March 16, 2001, appellant filed a timely notice of appeal seeking appellate review of the trial court's order denying the writ petition. The appeal was ordered expedited on April 2. On July 19, this court reconsidered the trial court's decision not to seal the record, and ordered that the record be filed under seal.

On June 27, 2001, respondents filed with their opening brief a motion to dismiss the appeal for a failure to exhaust administrative remedies. On July 27, respondents filed a motion seeking sanctions from appellant for the filing of a frivolous appeal. Both motions have been deferred for resolution pending a decision on the merits of the appeal.

## DISCUSSION

## I

### *The Statutory Scheme*

We begin with an overview of the statutory scheme, which lays the framework for the procedural and substantive challenges raised on appeal. Under state law, a licensed hospital facility must have "a formally organized and self-governing medical staff responsible for 'the adequacy and quality of the medical care rendered to patients in the hospital.' (Cal. Code Regs., tit. 22, § 70703, subd. (a).)" (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 10 [56 Cal.Rptr.2d 706, 923 P.2d 1], italics omitted; *Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 826-827 [227 Cal.Rptr. 1].) The medical staff acts primarily through a number of peer review committees, which, along with other responsibilities, assess the performance of physicians currently on staff, review the need for and results of each surgery performed in the hospital, and the control of in-hospital infections. (Cal. Code Regs., tit. 22, § 70703, subds. (b) & (d).) If a peer review committee recommends that the privileges of the physician be restricted or revoked because of the manner in which he or she exercised those privileges, a series of procedural mechanisms kick into play—all governed by state law. (Bus. & Prof. Code, §§ 809-809.8; Cal. Code Regs., tit. 22, § 70703, subd. (b).)

In 1989, the state Legislature enacted California Business and Professions Code[4] section 809 et seq. for the purpose of opting out of the federal Health Care Quality Improvement Act of 1986 (42 U.S.C. § 11101 et seq.), which was passed to encourage physicians to engage in effective peer review. California chose to design a peer review system of its own, and did so with the enactment of these sections. (Stats. 1989, ch. 336, § 1, pp. 1444-1445.) Section 809 provides generally that peer review, fairly conducted, is essential to preserving the highest standards of medical practice and that peer review which is not conducted fairly results in harm both to patients and healing arts practitioners by limiting access to care. (§ 809, subd. (a)(3), (4).) The statute thus recognizes not only the balance between the rights of the physician to practice his or her profession and the duty of the hospital to

---

[4]All further references are to the Business and Professions Code unless otherwise noted.

ensure quality care, but also the importance of a fair procedure, free of arbitrary and discriminatory acts. (See *Webman v. Little Co. of Mary Hospital* (1995) 39 Cal.App.4th 592, 599 [46 Cal.Rptr.2d 90].)

The statutory scheme delegates to the private sector the responsibility to provide fairly conducted peer review in accordance with due process, including notice, discovery and hearing rights, all specified in the statute. (*Shacket v. Osteopathic Medical Board* (1996) 51 Cal.App.4th 223, 231 [58 Cal.Rptr.2d 715]; see §§ 809 to 809.8.) A hospital is required to establish high professional and ethical standards and to maintain those standards through careful selection and review of its staff. (*Rhee v. El Camino Hospital Dist.* (1988) 201 Cal.App.3d 477, 489 [247 Cal.Rptr. 244].) To comply with the statute's mandate, the hospital's medical staff must adopt bylaws that include formal procedures for " 'the evaluation of staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate.' [Citation.]" (*Oliver v. Board of Trustees, supra,* 181 Cal. App.3d at p. 827.) It is these bylaws that govern the parties' administrative rights. (*Joel v. Valley Surgical Center* (1998) 68 Cal.App.4th 360, 365 [80 Cal.Rptr.2d 247].) Section 809, subdivision (a)(8) provides that medical staff bylaws in an acute care hospital setting shall include written provisions implementing sections 809 to 809.8.

Appellant raises several issues challenging whether respondents have complied with section 809. Appellant argues that the medical staff bylaws at Saint Agnes do not properly implement the provisions of sections 809-809.8, and that the notice given to him concerning the proposed final action did not comply with the requirements of section 809.1, subdivisions (b) and (c).[5] Appellant also argues that respondents failed to comply with section 809.2,[6] because appellant was not given the names of the doctors involved in the

---

[5]Section 809.1, subdivisions (b) and (c) provide as follows:

"(b) The peer review body shall give the licentiate written notice of the final proposed action. This notice shall include all the following information:

"(1) That an action against the licentiate has been proposed by the peer review body which, if adopted, shall be taken and reported pursuant to Section 805.

"(2) The final proposed action.

"(3) That the licentiate has the right to request a hearing on the final proposed action.

"(4) The time limit, within which to request such a hearing.

"(c) If a hearing is requested on a timely basis, the peer review body shall give the licentiate a written notice stating all of the following:

"(1) The reasons for the final proposed action taken or recommended, *including the acts or omissions* with which the licentiate is charged.

"(2) The place, time, and date of the hearing." (Italics added.)

[6]Section 809.2 provides, along with other procedural safeguards, the right to voir dire the hearing officer or panel members, if the hearing is conducted before a panel, and "to challenge the impartiality of any member or hearing officer." (§ 809.2, subd. (c).) It also gives

initial internal peer review or proprietary information concerning the reappointment summary program used in the peer review process—the Midas program.

## II

### *Standard of Review*

Appellant's challenges come on appeal from the denial of a petition for writ of mandate. We must begin our analysis by setting forth the applicable standard of review.

■ Appellant has based his challenge on the failure of respondents to comply with the law. Therefore, our review is limited to that of traditional writ of mandate. A traditional mandamus is sought to enforce a nondiscretionary duty to act on the part of a court, an administrative agency, or officers of a corporate or administrative agency. (Code Civ. Proc., § 1085; *San Elijo Ranch, Inc. v. County of San Diego* (1998) 65 Cal.App.4th 608 [76 Cal.Rptr.2d 601]; *Timmons v. McMahon* (1991) 235 Cal.App.3d 512, 517-518 [286 Cal.Rptr. 620].) There are two requirements essential to issuance of a writ of mandate under Code of Civil Procedure section 1085: (1) the respondent has a clear, present, and usually ministerial duty to act; and (2) the petitioner has a clear, present, and beneficial right to performance of that duty. (*Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist.* (1996) 44 Cal.App.4th 1391, 1414 [52 Cal.Rptr.2d 395]; *Hutchinson v. City of Sacramento* (1993) 17 Cal.App.4th 791, 796 [21 Cal.Rptr.2d 779].) Mandate will not issue to compel action unless it is shown the duty to do the thing asked for is plain and unmixed with discretionary power or the exercise of judgment. (*Hutchinson v. City of Sacramento, supra,* 17 Cal.App.4th at p. 796.) Thus, a petition for writ of mandamus under Code of Civil Procedure section 1085 may only be employed to compel the performance of a duty that is purely ministerial in character. (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 501 [2 Cal.Rptr.2d 50].) In addition, a petitioner is required to show there was no adequate remedy at law available to remedy the resulting harm. (See *Omaha Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1266, 1271-1275 [258 Cal.Rptr. 66].)

■ In reviewing a trial court's ruling on a writ of mandate, an appellate court is "ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. [Citation.]"

---

the physician an opportunity to inspect and copy "any documentary information relevant to the charges which the peer review body has in its possession or under its control." (§ 809.2, subd. (d).)

(*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352].) However, here the duty appellant seeks to enforce is one derived from statute. The question is thus of a legal nature: what does the statute require? The interpretation or construction of a statute is purely a question of law. (*Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 974 [97 Cal.Rptr.2d 280]; *Rodriguez v. Solis, supra,* 1 Cal.App.4th at p. 502.) When the facts are undisputed and we are confronted with questions of law only, we are to address the legal issues de novo. (*Dolan-King v. Rancho Santa Fe Assn., supra,* 81 Cal.App.4th at p. 974.)

## III

### *Exhaustion of Administrative Remedies*

 Respondents contend that appellant's claim is barred for failure to exhaust administrative remedies. They argue that appellant is attempting to bypass the administrative proceedings and is bringing questions of fact and law to the court prematurely. They point out that the hearing officer ruled in their favor on the adequacy of the notice and the document production and that appellant never allowed the hearing to go to final decision, thereby forgoing the internal appeal process established by the bylaws.

We agree that appellant's failure to exhaust administrative remedies has some bearing on our resolution of the issue. For instance, the failure to exhaust administrative remedies prevents appellant from seeking relief through administrative mandamus (Code Civ. Proc., § 1094.5), which provides judicial review of *final* administrative proceedings. (See Code Civ. Proc., § 1094.5; *Keeler v. Superior Court* (1956) 46 Cal.2d 596, 599 [297 P.2d 967]; *Morton v. Board of Registered Nursing* (1991) 235 Cal.App.3d 1560, 1566, fn. 5 [1 Cal.Rptr.2d 502]; *Alta Loma School Dist. v. San Bernardino County Com. on School Dist. Reorganization* (1981) 124 Cal.App.3d 542, 554 [177 Cal.Rptr. 506].) Thus, a member of an organization cannot seek judicial review of a grievance against that organization without first exhausting the applicable administrative remedies. (*Joel v. Valley Surgical Center, supra,* 68 Cal.App.4th at p. 365.) Consequently, a doctor who is challenging the propriety of a hospital's denial or withdrawal of staff privileges must pursue the internal remedies afforded by that hospital to a final decision on the merits before resorting to the courts for relief. (*Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 469 [131 Cal.Rptr. 90, 551 P.2d 410]; *Bollengier v. Doctors Medical Center* (1990) 222 Cal.App.3d 1115, 1125 [272 Cal.Rptr. 273].) This requirement both accords recognition to the expertise of the organization's quasi-judicial tribunal and promotes judicial efficiency by unearthing the relevant evidence

and providing a record that the court may review. (*Westlake Community Hosp. v. Superior Court, supra,* 17 Cal.3d at p. 476.) "The exhaustion doctrine 'is not a matter of judicial discretion, but is a fundamental rule of procedure' (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942, 132 A.L.R. 715]) under which 'relief must be sought from the administrative body and this remedy exhausted before the courts will act' (*id.* at p. 292)." (*Economic Empowerment Foundation v. Quackenbush* (1997) 57 Cal.App.4th 677, 684 [67 Cal.Rptr.2d 323].)

■ When seeking relief under traditional mandamus, the exhaustion requirement speaks to whether there exists an adequate legal remedy. If an administrative remedy is available and has not yet been exhausted, an adequate remedy exists and the petitioner is not entitled to extraordinary relief. "A remedy will not be deemed inadequate merely because additional time and effort would be consumed by its being pursued through the ordinary course of the law. (*Rescue Army* v. *Municipal Court* (1946) 28 Cal.2d 460 [171 P.2d 8].)" (*Omaha Indemnity Co. v. Superior Court, supra,* 209 Cal.App.3d at p. 1269.) Inconvenience does not equal irreparable injury. (*Ibid.*)

Nor does a ruling adverse to the petitioner in the administrative procedure necessarily mean the decision is final. An administrative hearing officer, much like a court, may change his or her mind about the production of documents, or decide to tailor the admission of evidence in light of earlier discovery-type orders to ensure fairness. (*Omaha Indemnity Co. v. Superior Court, supra,* 209 Cal.App.3d at pp. 1274-1275.) In this case, the hearing officer's rulings on procedural matters were open to reconsideration whenever new developments impacted the fairness of a prior ruling or required reevaluation.

There are exceptions to the exhaustion doctrine. ■ "The doctrine is inapplicable where 'the administrative remedy is inadequate [citation]; where it is unavailable [citation]; or where it would be futile to pursue such remedy [citation].'" (*Automotive Management Group, Inc. v. New Motor Vehicle Bd.* (1993) 20 Cal.App.4th 1002, 1015 [24 Cal.Rptr.2d 904].) A remedy is not adequate if it does not square with the requirements of due process. (*Bockover v. Perko* (1994) 28 Cal.App.4th 479, 486 [34 Cal.Rptr.2d 423].)

■ An essential part of appellant's challenges is that the bylaws, which govern the administrative procedure, do not comport with the statutory minimums. The argument has two components related to seeking extraordinary relief. First, the argument includes an assertion that respondents have a

duty to provide a procedural mechanism for peer review which offers the statutory procedural safeguards. Second, that absent compliance with the statutory procedural safeguards, the administrative procedure established by the bylaws does not comport with due process. Under either or both of these, the failure to exhaust administrative remedies, in and of itself, will not bar relief.

Respondents argue this court's decision in *Bollengier v. Doctors Medical Center, supra,* 222 Cal.App.3d 1115, controls and requires that we dismiss appellant's claim under the exhaustion doctrine. We think not. In *Bollengier,* the court noted that the petitioner's claim was a failure to comply with the bylaws and that he had expressly stated he was not challenging the bylaws as written. (*Id.* at pp. 1126, 1127.) Here, appellant alleges the bylaws themselves are deficient and fall below the dictates of due process. As we stated in *Bollengier,* "A party is not required to exhaust the available administrative remedies when those administrative procedures are the very source of the asserted injury. [Citation.] This rule is merely another facet of the inadequate administrative remedy exception to the exhaustion rule. [Citation.] Under this exception, a party is excused from exhausting the administrative remedies where the challenge is to the constitutionality of the administrative agency itself *or the agency's procedure.* [Citation.]" (*Bollengier v. Doctors Medical Center, supra,* 222 Cal.App.3d at p. 1127, italics added.)

## IV

### *Language of Statute is Mandatory*[7]

Appellant's contentions thus survive only if he can establish that: 1) the statutory procedural requirements are mandatory and must be included in the MEC bylaws; 2) that the administrative proceedings conducted did not comport to the dictates of due process and therefore his failure to exhaust the administrative proceeding is excused; and 3) that because of the procedural deficiency, he has no other legal remedy and would suffer irreparable injury.

We conclude that appellant is not entitled to the requested relief. However, we use two separate pathways to reach our decision, one in considering appellant's challenge to the adequacy of the notice given and to the right to voir dire JRC panel members, and the second in considering his challenge to the hearing officer's ruling concerning appellant's right to certain documents.

---

[7]On May 9, 2001, appellant filed a motion asking this court to take judicial notice of the legislative history of section 809 et seq. We hereby grant the motion.

## A. *Section 809.1*

Assuming we agree with appellant that the requirements of sections 809.1 and 809.2 are mandatory, not advisory, and that the bylaws governing peer review of a licensed physician in California must include the procedures set forth in the statute, events occurring subsequent to the trial court's ruling now provide appellant with an adequate legal remedy.

As we read the statute, although it delegates to the private sector the responsibility to provide fairly conducted peer review in accordance with due process, including notice, discovery and hearing rights, it also defines what constitutes minimum due process requirements for the review process. (See *Shacket v. Osteopathic Medical Board, supra*, 51 Cal.App.4th at p. 231.) The statute states that the bylaws of an organized medical staff in California *shall* include written provisions implementing sections 809 to 809.8. (§ 809, subd. (a)(8).) Mandatory, not discretionary, language is used.

When the language of a statute is clear and unambiguous, there is no need for construction or resort to the legislative history, and the court should apply its plain meaning. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *Great Lake Properties, Inc. v. City of El Segundo* (1977) 19 Cal.3d 152, 155 [137 Cal.Rptr. 154, 561 P.2d 244]; *County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1010 [78 Cal.Rptr.2d 272].) As our state Supreme Court noted in a recent decision: "A peer review committee may informally investigate a complaint or an incident involving a staff physician. If the committee proposes to recommend that the privileges of the physician be restricted or revoked because of the manner in which he or she exercised those privileges, the physician is entitled to written notice of the charges and may request a formal hearing. (Bus. & Prof. Code, § 809.1.) If a hearing is requested, it must be conducted pursuant to *strictly* circumscribed procedures. (*Id.*, §§ 809.2-809.6.)" (*Arnett v. Dal Cielo, supra,* 14 Cal.4th at p. 10, italics added.)

The statute allows for and encourages effective peer review, while at the same time it balances the interests of both the physician and the public in ensuring fair, nonarbitrary, and nondiscriminatory procedures. (*Webman v. Little Co. of Mary Hospital, supra,* 39 Cal.App.4th at p. 599; *Rhee v. El Camino Hospital Dist., supra,* 201 Cal.App.3d at p. 489.) It does this by defining the minimum procedures required and by mandating strict compliance with the procedures outlined. (*Arnett v. Dal Cielo, supra,* 14 Cal.4th at pp. 9-10.)

The legislative history confirms the intent of the statute was to provide *minimum* statutory procedural rights and protections to physicians subject to

adverse action in a peer review system. (Sen. on Judiciary, Analysis of Sen. Bill No. 1211 (1989-1990 Reg. Sess.) as amended Apr. 12, 1989; see also Aug. 30, 1988, letter from Assemblymembers Phillip Isenberg & Lloyd G. Connelly to Mr. Mark Paul of The Sacramento Bee seeking editorial support of Sen. Bill No. 1211.)

Section 809.1, subdivision (c)(1) requires that the notice contain "[t]he reasons for the final proposed action taken or recommended, including the acts or omissions with which the licentiate is charged." The former bylaws did not require notice of the specific acts or omissions charged or even a statement of the reasons for the proposed action. However, on May 17, 2001, after appellant's writ petition was denied in the trial court, the MEC amended the bylaws to include the statutory minimum requirements for adequate notice. The amended section 7.3-1(e) provides the following shall be included in the notice of proposed action: "The reasons for the proposed action, *including the acts or omissions with which the member is charged.*" (Bylaws, § 7.3-1(e), as amended May 17, 2001, italics added.)

On May 17, respondents reissued a notice of judicial review committee hearing, and attached to it a new statement of Reasons for Action. The new notice included the initial statement that the appellant's "conduct or acts, including a pattern of conduct, [were] detrimental to the delivery of quality patient care within the Hospital and/or below applicable professional standards and/or contrary to Medical Staff Bylaws and/or Rules and Regulations to the extent that restriction on privileges are necessary," supported by short summaries of 15 chart examples. It added for each chart a paragraph entitled "Acts or Omissions," which explains in each case the alleged deficiency.

Despite the amendments to section 7.3-1(e), appellant continues to complain that the amended notice and the amended bylaws remain inadequate. We disagree.

The new notice clearly provides appellant with adequate information concerning the nature of the acts and omissions which form the basis for the hospital's concerns. The notice ties each act or omission stated to a specific patient chart. For example, the first case summary listed includes the following under the section headed Acts or Omissions: "This case involves a failure on the part of the physician to control bleeding during surgery. . . ." The second case states the physician's medical management fell below the applicable standard of care/practice because of the physician's "failure to control oozing during closure of the neck incision and to otherwise take proper measures to control bleeding." The fifth case summary describes a

third degree burn suffered by a patient caused by a hot IV bag placed to position the patient's neck. Under the Acts and Omissions section the notice states, "No burns or deep skin injury, however, should occur by positioning of the patient. This physician's medical management of this case was below the applicable standard of medical care/practice because a heated bag was used resulting in a third degree thermal burn."

With respect to the statistical information concerning appellant's infection rate, the notice states it is a physician's responsibility to take all appropriate steps necessary to mitigate the possibility of deep postoperative infections and that this physician's rate is "quadruple the rate of this doctor's peers at [Saint Agnes] and is significantly higher than for . . . surgeons nationwide." Although not included in every chart summary where infection is the key problem identified, in the summary of chart 15 [MR480150] the notice states, "[a]n excessive infection rate by one surgeon suggests improper surgical technique, peri-operative care, or both." This is sufficient to place the doctor on notice that the hospital believes substandard practice is the cause of the infection rate. The hospital or MEC is not in the position to know the exact act or omission causing the increased infection rate because neither is present during surgery. However, by placing appellant on notice that the infection rate is high enough to suggest it could be caused only by substandard practice, the physician knows what he must defend against. This is all that is necessary under the statute and due process.

Additionally, the prehearing exchange of documents provided appellant with additional information, including the reports of the internal and external reviewers. Appellant now has ample information concerning the charges against him and any claim that he is lacking in information is disingenuous. As a result of the modification of the bylaws, and the information provided appellant in the revised notice and the prehearing exchange of documents, appellant has not established harm that this court may address. Absent a showing of irreparable injury, appellant is not entitled to the relief sought.

B. *Section 809.2, subdivision (c)*

Appellant also challenges the validity of the bylaws under Business and Professions Code section 809.2, subdivision (c), which provides physicians a right to voir dire for bias members of the judicial review panel. Although the earlier version of the bylaws did not include a right to voir dire panel members, the deficiency has now been corrected with the May 17, 2001, amendments. Bylaws section 7.4-1(e) as amended provides that a physician facing a proposed adverse action "shall be entitled to a reasonable opportunity to question and challenge the impartiality of judicial review committee

members and the hearing officer. Challenges to the impartiality of any judicial review committee member or the hearing officer shall be ruled on by the hearing officer." (Bylaws, § 7.4-1(e), as amended May 17, 2001.)

We also note appellant cannot establish he lacks an adequate remedy at law with respect to this argument, because despite the deficiency in the bylaws, the hearing officer understood the statute required an opportunity to conduct voir dire and stated on the record that an extensive voir dire would be permitted. The hospital never objected to a voir dire of the hearing officer or the panel members. Appellant filed his writ of mandate prior to voir dire actually commencing. Thus, there is nothing in the record to establish appellant would have been denied the opportunity to voir dire panel members.

C. *Section 809.2, subdivision (d)*

██ Appellant's remaining contention is that respondents have failed to comply with their statutory duty to produce certain documents to which he claims a right to have produced.

Section 7.4-1(a)(1) and (2) of the bylaws provides that:

"A Member or applicant shall have the right to inspect and copy at his expense any documentary information relevant to the charges which the Medical Staff has in its possession or under its control, as soon as practicable after the receipt of the request for a hearing. The Medical Executive Committee shall have the right to inspect and copy at the Medical Executive Committee's expense any documentary information relevant to the charges which the Member or applicant has in his possession or control, as soon as practicable after receipt of the Medical Executive Committee's request. The failure of either party to provide access to this information at least (30) days before the hearing shall constitute good cause for a continuance. The right to inspect and copy by either party does not extend to:

"(1) confidential information referring to individually identifiable licentiates, other than the Member or applicant under review, and

"(2) patients' names and patient-identifying information."

The statute defines the right as follows: "(d) The licentiate shall have the right to inspect and copy at the licentiate's expense any documentary information relevant to the charges which the peer review body has in its possession or under its control, as soon as practicable after the receipt of the

licentiate's request for a hearing. The peer review body shall have the right to inspect and copy at the peer review body's expense any documentary information relevant to the charges which the licentiate has in his or her possession or control as soon as practicable after receipt of the peer review body's request. The failure by either party to provide access to this information at least 30 days before the hearing shall constitute good cause for a continuance. The right to inspect and copy by either party does not extend to confidential information referring *solely* to individually identifiable licentiates, other than the licentiate under review. The arbitrator or presiding officer shall consider and rule upon any request for access to information, and may impose any safeguards the protection of the peer review process and justice requires." (§ 809.2, subd. (d), italics added.)

There is a subtle difference. Clearly, the statute provides a right to access all relevant information, except that which is (1) confidential and (2) refers solely to physicians other than appellant.[8] The May 17, 2001, amendments did not affect section 7.4-1(a)(1) and (2).

Appellant contends he was denied access to two categories of documents[9] under the bylaws to which he had a statutory right: (1) the names of those physicians who conducted the initial review of appellant's charts after they were flagged by the Midas program and brought to the attention of the surgery department, and (2) proprietary documents explaining how the Midas software program was used to produce the statistical flags.

Although we agree with appellant that the statute governs respondents' document production requirements and that the bylaws should not restrict disclosure independent of the restrictions appearing in section 809.2, subdivision (d), we find appellant is not entitled to relief because he cannot show he has suffered irreparable harm nor that he lacks an adequate legal remedy.

1. *Adequate legal remedy*

The statute anticipates that any dispute as to what documents are to be produced is to be resolved by the hearing officer. (§ 809.2, subd. (e).) Here,

---

[8]The statute does not provide exception for withholding patient names and other identifying information. However, appellant does not challenge this variation from the statutory requirements and there may be other statutory and policy considerations implicated when confidential patient information is sought.

[9]During the course of the preliminary proceedings, appellant requested numerous documents from respondent and made numerous requests of the hearing officer to order production of these documents. In every case except the two identified here, appellant either successfully obtained an order from the hearing officer requiring production, or was voluntarily provided the requested documents by respondents.

the hearing officer considered appellant's arguments and rendered his decisions based on the statutory requirements—not the bylaws. The hearing officer continuously confirmed appellant's right to receive all relevant documents, while at the same time recognizing the statutory standard was not as broad as a civil discovery standard.

Section 809.2, subdivision (d), provides that when there are competing interests such as a need to protect against disclosure of confidential or delicate information balanced with a need for a fair hearing, the hearing officer is charged with deciding whether documents are to be disclosed. The hearing officer "shall consider and rule upon any request for access to information, and may impose any safeguards the protection of the peer review process and justice requires." (§ 809.2, subd. (d).) Subdivision (e) of section 809.2 requires that the hearing officer consider (1) whether the information sought may be introduced to support or defend the charges; (2) the exculpatory or inculpatory nature of the information sought, if any; (3) the burden imposed on the party in possession of the information sought, if access is granted; and (4) any previous requests for access to information submitted or resisted by the parties to the same proceeding. Thus, despite appellant's contention that he has an "absolute right" to any relevant documents, the statute grants the hearing officer discretion to balance the identified interests within the framework of the statutory guidelines and render a decision which would protect both interests and yet ensure fairness of the procedure.

The hearing officer explained that although he was denying the request for documents, he would continue to evaluate appellant's claim that the information was needed because respondents' case had to be based on the initial statistical information, otherwise respondents could not show a pattern of conduct. Respondents represented to the hearing officer the hospital would be relying on the opinion of the independent reviewer. It is for this very reason courts hesitate to intervene in administrative proceedings which are not yet final. Because the hearing has not proceeded to its final end, appellant cannot meet his burden to show that the withheld information denied him a fair hearing, i.e., that he has suffered harm, or that the hearing officer would not reconsider the ruling in light of subsequent evidentiary developments. He cannot show there exists no adequate legal remedy, and for this reason alone we will deny him relief on appeal. (See, e.g., *Omaha Indemnity Co. v. Superior Court, supra,* 209 Cal.App.3d at p. 1266; *Bollengier v. Doctors Medical Center, supra,* 222 Cal.App.3d at p. 1126.)

## 2. *Computer information*

With respect to the computer information requested,[10] respondents were ordered to provide appellant with all existing documents related to the computer programs (Midas and any other being used) except those of a proprietary nature, the production of which would violate the hospital's licensing agreement(s) with the owner(s) of the software program(s). Although the hearing officer initially proposed an in camera hearing, respondents argued that even providing the hearing officer with the information would violate the licensing agreement, and they continued to argue appellant's request exceeded the type of discovery anticipated by the statute or case law. The hearing officer, in reconsidering his initial ruling, stated he understood the software programs played only a preliminary collection role. They identified files which fell outside the parameters set by the computer program. No action against appellant was taken or based on the initial flagging by the program. And, because appellant was provided with information concerning how the reappointment statistics were used and a key to the ratings, at least initially, this was sufficient.

The hearing officer noted that if documents of a proprietary nature were ordered produced, it was highly likely subsequent legal action would further delay the proceedings. This would burden respondents and the review process. The ability of the hospital to act quickly to protect patients would be thwarted. The reasoning of the hearing officer is consistent with the policy statements found in the statutory scheme. Given the marginal relevance of the evidence requested, we do not believe the hearing officer abused his discretion in refusing to order production of information made confidential by the licensing agreements.

## 3. *Names of reviewing physicians*

Similarly, appellant's request for the names of those Saint Agnes physicians who participated in the internal peer review was denied because the hearing officer found the names of the internal reviewers was of only marginal relevance to the charges brought against appellant. We agree. The

---

[10]Appellant's request for production included very broad discovery-like language seeking all information which had any bearing on the use and purchase of the Midas reappointment program. As to those items not produced and not covered by the licensing agreement, the hearing officer accepted respondents' representation that no working papers concerning the purchase of the system, vendor promotional items, or internal reports comparing Midas with other systems remain in existence. The purchase was made in 1989 and despite a thorough search, hospital staff was unable to locate any documents falling within the request. We are bound by the hearing officer's factual finding because it is supported by the evidence. (*Saathoff v. City of San Diego, supra,* 35 Cal.App.4th at p. 700.) ·

internal review comments were provided to appellant—only the names of the internal reviewing physicians were redacted.

We find support for our decision in *Goodstein v. Cedars-Sinai Medical Center* (1998) 66 Cal.App.4th 1257 [78 Cal.Rptr.2d 577] (*Goodstein*). In *Goodstein,* the physician in question was asked to take a drug test in response to confidential information received by the medical staff committee suggesting the physician had a drug problem. When the hospital refused to identify those who provided the initial report, the doctor sought a writ of mandate. The trial court agreed with the doctor that failure to identify the source of the complaint violated due process. The appellate court disagreed. It noted that the physician had vastly overstated the role of the initial complainants in the peer review process, and concluded the individuals reporting merely triggered a review by the committee of the physician. The court also noted the reluctance people would feel coming forward with information about a physician if their identities could not be kept confidential. (*Goodstein, supra,* 66 Cal.App.4th at pp. 1266-1267; see also *Mir v. Charter Suburban Hospital* (1994) 27 Cal.App.4th 1471, 1485 [33 Cal.Rptr.2d 243] [physicians might seek to avoid onerous burden of serving on peer review committees and become wary of providing candid evaluations if fees were imposed on hospital].)

Although the review system in place in *Goodstein* is substantially different than the JRC here (it involves substance abuse allegations, not substandard medical practice), there are parallels. The medical staff committee's role in *Goodstein* was to provide notice of the charges to the doctor and undertake a review of whether the doctor indeed had a substance abuse problem. Similarly, under respondents' bylaws, an investigation may be initiated for a variety of reasons. The statistical flag raised by the Midas program and the subsequent peer review of appellant's charts resulted in the matter being referred to a neutral external reviewer not associated with either appellant or respondents. As was the case in *Goodstein,* the MEC's requests and recommendations, now before the JRC, are based primarily on the intervening and independent evaluation of the external reviewer. (The recommendation of Berg was adopted virtually verbatim by the MEC.) All information concerning the acts and omissions of which appellant is charged has been provided. There are also strong policy concerns for keeping the names of the internal reviewers confidential.

As the court noted in the *Goodstein* decision: "Furthermore, legitimate concerns support the policy of nondisclosure. Because the initial complainant is often an individual closely associated with the physician, the individual is legitimately concerned about retaliation. Disclosure of that person's

identity would affect the willingness of the person to disclose information about a physician's substance abuse problem which could be endangering patient safety. Protecting the identities of the complainants in order to encourage the free flow of information about such an important concern (patient safety) is proper and, under certain circumstances, is compelled by the right to privacy found in our state Constitution. [Citation.] Furthermore, the policy of nondisclosure furthers the goal of having the Committee make its determination based upon its meeting with and independent evaluation of the physician. *Requiring the Committee to disclose the source(s) to the physician would simply deflect the inquiry from the pertinent question of whether, based upon the Committee's observations and evaluations, there is a danger to patient safety to the question of who said what to the Committee in the first instance.*" (*Goodstein, supra,* 66 Cal.App.4th at p. 1267, italics added.)

Appellant also contends this information is required for adequate voir dire of the JRC panel members. Because the JRC members are also not told who did the initial flagging of the files, we do not see how the individuals' names could be used to establish bias. The statute provides for an exchange of witnesses and an opportunity to voir dire the panel members for any prior knowledge, financial or other interest in the proceeding, or pre-formed biases. (§ 809.2, subd. (c).) Any benefit to having the names of the initial reviewers is outweighed by the policy concerns raised by allowing dissemination of this information. Appellant has been given all relevant documents including the initial reports from the infection control officer and members of the surgery department concerning the infection rate and the Midas report, as well as minutes of the MEC meetings where his case was discussed. This information should be sufficient to ensure adequate voir dire of panel members.

### 4. *Not a Discovery Standard*

We also agree with respondents that section 809.2, subdivision (d) was not intended to create a broad documentary discovery right. A fair reading of the statute provides that the right of production extends only to those documents relevant to the charges "which the *peer review body* has in its possession or under its control" (*ibid.,* italics added) and which is further limited by section 809.2, subdivision (e). We are not persuaded that the case relied upon by appellant, *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434 [282 Cal.Rptr. 819], requires a different result. The documents withheld in *Rosenblit* were documents which formed the basis of the charges and those made available to the JRC, including the comments of the initial reviewers and the charts which formed the basis of the charges. Withholding

this information made preparing a defense impossible. We have already stated that appellant has been given copies of every chart mentioned in the notice of charges, and the full comments of all initial reviewers. Appellant also received the name and full report of the external reviewer and the statistical report generated by the Midas program.

For these reasons, appellant cannot establish the writ petition was erroneously denied; he has not shown he is entitled to extraordinary relief.[11]

## V

### *Motion for Sanctions*

■■■ Respondents have asked this court to impose sanctions. We decline to do so. Appellant's arguments concerning the deficiencies found in the bylaws under which the proceeding was initiated were not frivolous. The bylaws were not in full compliance with the statute and, no doubt in part because of this action, those deficiencies have been for the most part corrected. As was explained in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179], " 'an appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit. [Citation.]' " (*Kappel v. Bartlett* (1988) 200 Cal.App.3d 1457, 1469-1470 [246 Cal.Rptr. 815].) Although appellant's action has undoubtedly delayed the JRC and resolution of this matter, we cannot say the appeal was brought for an improper motive. The motion for sanctions is denied.

### COSTS

Generally, a prevailing party is entitled to costs following the "general and unqualified affirmance" of the judgment, order or the dismissal of the appeal. (Cal. Rules of Court, rule 26(a)(1). However, the appellate court has the discretion to deviate from the general "prevailing party" rule and make any appropriate award or apportionment of costs in "the interests of justice." In an appropriate case, costs may be awarded to the losing party or the parties may be directed to bear their own appellate costs. (Cal. Rules of Court, rule 26(a)(1).)

---

[11]Appellant has asked this court to declare him the prevailing party even if we affirm the trial court's denial of the petition for writ because the amendments to the bylaws were in response to appellant's lawsuit. We decline to do so, as this is a determination best left to the trial court on an appropriate motion.

 There is precedent for awarding costs to the appellant when the appeal has been dismissed because subsequent events, motivated by the litigation itself, rendered the appeal moot. (*Bell v. Board of Supervisors* (1976) 55 Cal.App.3d 629, 637 [127 Cal.Rptr. 757] [appeal caused legislative changes which mooted appeal].) In *Bell* the court found that although the plaintiff had lost his appeal and with it the case, he achieved an ephemeral success because the case precipitated the very legislative changes he claimed. The court found "[u]nder the circumstances, we believe it would be inequitable to require plaintiff to bear the costs of this appeal." (*Id.* at p. 637.)

This case is similar because the court's affirmance of the appeal is based for the most part on a determination by this court that the acts of Saint Agnes, subsequent to the trial court's denial of the petition for writ, rendered the major issues raised by appellant moot. Appellant, as a result of this litigation, achieved what he asked for without a final judgment affirmed on appeal. Thus, although an affirmance, the termination of the appeal reflects on the merits of the appeal and establishes that the prevailing party in this action is actually the losing party on appeal. Costs are therefore awarded to appellant.

## DISPOSITION

The order denying the petition for writ of mandate or other appropriate writ relief is affirmed. Costs are awarded to appellant.

Wiseman, J., and Polley, J.,* concurred.

A petition for a rehearing was denied December 3, 2001, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied January 29, 2002. Baxter, J., did not participate therein.

---

*Judge of the Tuolumne Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.