[No. B168705. Second Dist., Div. Four. Apr. 18, 2005.]

GIL N. MILEIKOWSKY, Plaintiff and Appellant, v.
TENET HEALTHSYSTEM et al., Defendants and Respondents.

**COUNSEL**

Roger Jon Diamond for Plaintiff and Appellant.

Robinson, Calcagnie & Robinson and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Davis, Cowell & Bowe and Andrew J. Kahn for Union of American Physicians and Dentists as Amicus Curiae on behalf of Plaintiff and Appellant.

Parker Mills & Patel and David B. Parker for Association of American Physicians & Surgeons, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Christensen & Auer, Jay D. Christensen and Anna M. Suda for Defendants and Respondents.

## OPINION

CURRY, J.—Appellant Gil N. Mileikowsky, M.D., held staff privileges with respondent Encino-Tarzana Regional Medical Center (the Hospital) until it terminated those privileges.[1] More precisely, the Hospital determined not to reappoint Dr. Mileikowsky to staff in January 2000, a decision that permitted Dr. Mileikowsky to continue working there while a hearing on the denial took place. Then, in November 2000, the Hospital summarily suspended his staff privileges, which immediately cut off his use of its facilities.

California law (Bus. & Prof. Code, § 805 et seq.) codifies a physician's right to seek peer review of adverse decisions concerning staff membership. In an effort to implement the statutory provisions, the Hospital promulgated medical staff bylaws (Bylaws) which contain, among other thing, a description of its hearing and appellate review procedures, referred to as a "Fair Hearing Plan." In accordance with the Bylaws, a hearing was convened before a panel of peers (the Hearing Committee[2]) to review the Hospital's dual actions. The hearing went on for many sessions, but did not culminate in a finding on the substantive charges. Instead, the hearing officer terminated the proceedings based on Dr. Mileikowsky's having committed a number of alleged procedural transgressions, including violation of orders and disruption of hearing sessions. His decision was upheld after an administrative appeal.

Dr. Mileikowsky filed a petition for writ of mandate, contending that the hearing officer did not have the authority to suspend the hearing. He sought a new or further hearing. The trial court denied the writ. He appeals from the denial, supported by amicus curie briefs from the Association of American Physicians & Surgeons, Inc. (Association), Union of American Physicians and Dentists (Union), and Consumer Attorneys of California (Consumer Attorneys). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Denial of Dr. Mileikowsky's Reappointment Application*

Certain background facts are not in dispute. Dr. Mileikowsky's staff privileges at the Hospital commenced in 1986. In 1998, privileges were revoked on the ground that he had not timely submitted an application for reappointment, and had therefore voluntarily resigned. Dr. Mileikowsky,

---

[1] Respondent Tenet Healthsystem is, as we understand it, the Hospital's parent company. The two are jointly referred to herein as respondents.

[2] Dr. Mileikowsky refers to this body as the "Medical Hearing Committee" or MHC. Respondents prefer the term "Judicial Review Committee" or JRC. We use the term found in the Bylaws.

insisting that his failure to reapply was inadvertent, filed a petition for writ of mandate in a related lawsuit (*Mileikowsky v. Tenet*, Super. Ct. L.A. County, 1999, No. BS056525) seeking to set aside the determination that he had resigned.[3] The trial court granted a temporary restraining order and request for preliminary injunction in April 1999. Following that, the Hospital reversed course and acted on Dr. Mileikowsky's application for reappointment on January 11, 2000—by recommending that it be denied.[4] The stated grounds were that Dr. Mileikowsky engaged in "dangerous, disruptive, threatening, abusive and unprofessional conduct in relation to [Hospital] personnel, Medical Staff officers, and patients."[5]

Dr. Mileikowsky challenged the decision, seeking a hearing as provided in the Bylaws. Under the Bylaws, practitioners impacted by an "adverse recommendation or action," including "denial of reappointment" or "suspension of staff membership," are permitted to request a hearing before a "hearing committee" and to appeal any adverse decisions to an "appellate review body." (Bylaws, art. VIII, § 2.A.2, 2.A.3, 2.C, and 2.D.)

A hearing commenced, but in September 2000, the Hospital's advocate filed a motion contending that Dr. Mileikowsky had waived his hearing rights by failing to produce documents regarding termination of his medical staff privileges at Cedars-Sinai in 1998. The hearing officer submitted the issue to the Hearing Committee, which ruled that Dr. Mileikowsky had waived his

---

[3] Dr. Mileikowsky later filed a second complaint (*Mileikowsky v. Tenet Healthsystem*, Super. Ct. L.A. County, 2000, No. BC233153) which ended up essentially superseding the first complaint. That litigation culminated in the related appeal in *Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262 [26 Cal.Rptr.3d 831], from an order imposing sanctions on Dr. Mileikowsky, including both monetary sanctions and an order striking the complaint, for repeated refusals to provide discovery.

[4] To be precise, the action was undertaken by the Hospital's "Medical Executive Committee" (MEC), but since the actions of the MEC are, for all relevant purposes herein, the actions of the Hospital, we do not distinguish between the two.

[5] Details were provided in a June 2000 letter setting Hearing Committee review of the decision, which set forth 43 specific charges against Dr. Mileikowsky, including that he "disrupted a planned childbirth class" in 1989 by "refusing to vacate the doctors['] dining area"; copied records in violation of established policy in 1989, 1991, and 1993; ordered a nurse to modify a medication order written by another physician in 1990; failed to visit a patient for two days in 1990; negligently lacerated a patient's cervix in 1991; negligently perforated a patient's colon in 1991; sutured an episiotomy without anesthesia in 1995; and failed to complete documentation of medical records. A number of the charges had to do with lack of cooperation with attempts by the Hospital's peer committees to review his cases, including threatening to refuse to meet with one committee in 1989; failing to attend a meeting in 1990; interfering with another committee's review of the perforation incident; bringing court reporters to committee meetings; claiming that members were acting out of improper motives; failing to attend meetings in 1996; failing to respond in writing to allegations of misbehavior; leaving a 1998 meeting after only a few minutes; and refusing to accept certified letters containing notice of meetings.

right to a hearing. This was appealed to the appellate review body appointed pursuant to article VIII, section 6.D of the Bylaws.[6]

The appellate review body agreed that Dr. Mileikowsky violated article VIII, section 3.G of the Bylaws by deliberately delaying and refraining from producing evidence.[7] The appellate review body further agreed with the Hospital that article VIII, section 10.C of the Bylaws "provides the basis for waiver of rights under the Bylaws in a broad range of circumstances."[8] The appellate review body did not, however, uphold the ruling that the proceedings initiated by Dr. Mileikowsky should be terminated. It concluded instead that Dr. Mileikowsky should be disallowed from entering into evidence matters regarding his termination of medical staff and clinical privileges at Cedars-Sinai or any other matter related to documents that had not been produced by him on a timely basis. In addition, the Hearing Committee would be entitled to make adverse findings of fact against Dr. Mileikowsky based on his failure to produce documents.

### B. *Summary Suspension*

The appellate review body's decision reinstating proceedings on the decision to deny the reappointment application was issued on April 26, 2001. In the meantime, as we have seen, Dr. Mileikowsky's medical staff privileges at the Hospital were summarily suspended on November 16, 2000. The Hospital's letter of that date to Dr. Mileikowsky confirming the "oral notice [of his suspension] previously provided" stated that the suspension was based on the conclusion of the president of the medical staff and the chief executive officer that "failure to immediately suspend [Dr. Mileikowsky's] clinical privileges may result in an imminent danger to the health, safety, or well being of patients and/or others."

---

[6] Article VIII, section 6.D of the Bylaws permits the chair of the Hospital's governing board to appoint an appellate review committee to review decisions of a hearing committee. In his brief, Dr. Mileikowsky refers to this body as the "Appeal Body." Respondents simply call it "the Board." Again, we prefer the term used in the Bylaws.

[7] Article VIII, section 3.G of the Bylaws gives both sides the right to inspect and copy documentary information relevant to the charges against the physician. It further provides that disputes regarding requests for access to documents shall be submitted to the hearing officer "who may impose any safeguards deemed necessary in the interests and [*sic* (probably should be 'of')] fairness or for the protection of the peer review process."

[8] Article VIII, section 10.C of the Bylaws provides: "If at any time after receipt of notice of an adverse recommendation, action or result, a practitioner fails to make a required request or appearance or otherwise fails to comply with this Fair Hearing Plan or to proceed with the matter, s/he shall be deemed to have consented to such adverse recommendation, action or result and to have voluntarily waived all rights to which he might otherwise have been entitled under the medical staff bylaws then in effect or under this Fair Hearing Plan with respect to the matter involved."

Dr. Mileikowsky requested "as soon as possible . . . an explanation of the factual bases of [the Hospital's] conclusion that '. . . failure to immediately suspend [Dr. Mileikowsky's] clinical privileges may result in an imminent danger to the health, safety, or well being of patients and/or others.' "

A report dated November 28, 2000, described six incidents to support the summary suspension. The first occurred in February 1999, when Dr. Mileikowsky came to complain about the notice that his appointment had expired based on failure to submit an application for reappointment, he became "very angry, loud and aggressive" when a staff member refused to allow him to see his credential file. He also "roughly grabbed [another staff member who refused his request] by the lapel badge." It was further alleged that he cursed at the staff members and threatened to get them fired. The second stated basis for the suspension was a December 1999 incident where Dr. Mileikowsky was informed, during performance of a surgery, that his assistant did not have surgical privileges. Dr. Mileikowsky allegedly backed the operating room manager against a wall while screaming at her and jabbing his finger in her face. The third basis for the suspension was an August 2000 incident in which Dr. Mileikowsky took pictures to support his request for a new temporary restraining order in the related lawsuit. His actions purportedly caused one female medical staff obstetrician to be "startled, frightened and upset." The fourth incident occurred in October 2000, when Dr. Mileikowsky used a vacuum extractor during a delivery more than three times and applied fundal pressure during a difficult delivery. The fifth incident occurred on November 5, 2000. Dr. Mileikowsky asked odd questions of the attending nurse while performing a circumcision, and allegedly removed excessive skin. The sixth incident occurred on November 10, 2000, when Dr. Mileikowsky brought his "office manager" to view a delivery. The Hospital's security was instructed to prevent this person from observing the delivery, and Dr. Mileikowsky yelled at the security guard "in a very hostile manner."

To bolster the summary suspension, the report noted that the nurses' union had, on November 16, 2000, submitted a written complaint to the Hospital's chief executive officer complaining about Dr. Mileikowsky's behavior, and that Dr. Mileikowsky entered Hospital premises and attempted to utilize photocopying equipment after being informed of his suspension.

### C. *Administrative Hearing*

Dr. Mileikowsky requested a formal hearing to review the summary suspension. In response, the Hospital expressed its intent to both set a hearing on the summary suspension and restart the hearing on the denial of the request for reappointment. The hearing was to be held before a single Hearing Committee consisting of five members of the medical staff. Daniel

Willick was appointed hearing officer[9] and Dr. Richard Wulfsberg was assigned to be the advocate for the Hospital. Neither party would be represented by legal counsel, in accordance with article VIII, section 4C of the Bylaws.[10]

The general charges were summarized as follows: "A. You have engaged in a long and on-going pattern of dangerous and unacceptable mistreatment of patients, staff and medical staff. [¶] B. You have engaged in a pattern of unacceptable, aggressive verbal and physical assaults on hospital personnel. [¶] C. You have provided dangerous and substandard care in violation of express hospital rules. [¶] D. You have engaged in a long and on going pattern of interference and obstruction of the peer review process, without good cause, regarding issues related to your medical management of patients' [*sic*] and your conduct."

The Hospital listed 37 specific facts to support the general charges, essentially a compilation of the facts set forth earlier to support the Hospital's decisions to deny reappointment and summarily suspend staff privileges, with some of the older incidents omitted. The incidents began in 1990, and, as we have seen, ranged from such matters as possible medical mistakes to failure to attend meetings or cooperate with other physicians attempting to conduct peer review of patient treatment. Charge No. 27 specifically alleged that Dr. Mileikowsky had been summarily suspended by Cedars-Sinai in January 1998.

### 1. *Request for Dismissal of Charges/Bifurcation*

Dr. Mileikowsky objected to the number of charges and the age of the majority of the incidents described. He sought to have the older charges dismissed by the hearing officer. He also sought to have the hearing bifurcated so that matters pertaining to the summary suspension could be resolved first. At that time, he took the position that "[s]ince the By-laws limit the [Hearing Committee's] role to fact finding, it necessarily follows that [the hearing officer] must rule on issues of law, including motions to exclude evidence."

---

[9] Both sides acceded to his appointment in that capacity.

[10] Article VIII, section 4.C provides that "neither the petitioner, the executive committee nor the governing board shall be represented, by legal council [*sic*], before the Hearing Committee unless the Board, in its sole discretion, permits all sides to be represented by legal counsel" and that the petitioner "shall be entitled to be accompanied and represented at the hearing by a licensed practitioner who is not an attorney-at-law and who preferably is a member of hospital's medical staff."

The hearing officer ruled that he lacked authorization under either the Bylaws or California law to dismiss charges. The hearing officer further ruled that he lacked authority to stay the summary suspension and that "[b]ifurcation of these proceedings would be inappropriate since the [Hospital] contends that all of the charges against Dr. Mileikowsky are the basis for his summary suspension" and "bifurcation would not lead to any quicker decision on the summary suspension since the same evidence will be presented by the [Hospital] as the basis for both the summary suspension and the recommendation to terminate privileges." In the hearing officer's view, although the Hospital "initially based the summary suspension on certain limited charges" it was not precluded from contending at the hearing "that the summary suspension [was] justified by all of the allegations against Dr. Mileikowsky."

Dr. Mileikowsky repeatedly asked the hearing officer to reconsider his decision on bifurcation and issue a swifter decision on the summary suspension. When these efforts proved fruitless, he requested permission to address these issues directly to the Hearing Committee. On August 28, 2001, the hearing officer expressly ruled: "Dr. Mileikowsky may not present his motion for bifurcation to the [Hearing Committee]. Pursuant to the [Bylaws] [citation], the Hearing Officer determines the order of procedure at the hearing and makes all rulings on matters of procedure. . . . [The motion for bifurcation] which concerns procedure may not be presented to the [Hearing Committee]. [¶] . . . While I recognize that Dr. Mileikowsky disagrees with the procedures being followed at this hearing, he does not have the authority to decide what those procedures will be."

### 2. *Hearing Officer's Discovery Rulings*

In connection with the hearing, the Hospital requested that 20 categories of documents be produced, including "[a]ll documents identifying any professional medical, psychiatric, psychological, substance abuse or personnel counseling services [he] received" going back to his medical internship and a 1984 fellowship program, and documents reflecting his whereabouts on particular days from January 23, 1991, to July 6, 2000. In response to the parties' motions, the hearing officer ruled that some of the document requests were overbroad or violated Dr. Mileikowsky's right to privacy, but otherwise ordered the requested documents to be produced, acknowledging that certain documents might not exist due to the passage of time.

With regard to charge 27, the Cedars-Sinai charge, the hearing officer requested clarification concerning how the charges related to the Hospital's actions against Dr. Mileikowsky in 2000. By letter dated March 19, 2001, the Hospital supplied additional detail, alleging that Dr. Mileikowsky "failed to

provide the Credentials Committee with a suitable explanation for the Cedars-Sinai Medical Center action, thereby interfering with the Credentials Committee's ability to process [his] reappointment application." The letter narrowed the request to production of the formal written decisions that upheld termination of Dr. Mileikowsky's staff privileges at Cedars-Sinai. On April 12, the hearing officer ordered that those documents be produced.

In May 2001, the Hospital reported that Dr. Mileikowsky had failed to supply the requested Cedars-Sinai documents and asked that there be a finding that "Dr. Mileikowsky's suspension and subsequent termination at [Cedars-Sinai] occurred because Dr. Mileikowsky provided dangerous and substandard care which caused a potential or imminent danger of harm to patients."

In a ruling dated June 11, 2001, the hearing officer ruled that "the [Hospital] will be permitted to disclose to the Hearing Committee Dr. Mileikowsky's violation of my ruling that he produce the [Cedars-Sinai] Judicial Review Committee decision and findings in the matter which led to his suspension and loss of privileges and that he produce the written decision of the Governing Board of [Cedars-Sinai] affirming the decision of the Judicial Review Committee. The Hearing Committee will be permitted to learn that Dr. Mileikowsky's Medical Staff privileges at [Cedars-Sinai] were suspended and terminated due to a medical disciplinary cause or reason in November 1999 as a result of an accusation filed in January, 1998."

Dr. Mileikowsky protested, contending that Cedars-Sinai had not authorized him to release documents and pointing out that he had signed a release permitting Cedars-Sinai to release documents to the Hospital. The hearing officer did not change his ruling.

### 3. Hearing Officer's Ruling Re Written Submissions on Peer Review

As we have seen, some of the charges against Dr. Mileikowsky involved failure to cooperate in peer review with respect to his care of certain patients where there was no allegation that the care itself was deficient. In a June 11, 2001, ruling, the hearing officer instructed the parties to submit a brief statement in writing as to each allegation that Dr. Mileikowsky failed to cooperate in peer review involving patient care where there was no charge that Dr. Mileikowsky provided deficient patient care. These written submissions were to be submitted to the Hearing Committee and there was not to be any other presentation of evidence regarding underlying patient care in those cases.

In his August 24, 2001, letter, the hearing officer stated: "Dr. Mileikowsky is in default on my June 11, 2001 Ruling . . . which requires certain written submissions about peer review and patient care . . . ." In an October 12, 2001, ruling, after noting that Dr. Mileikowsky had still not submitted any statements, the hearing officer warned: "In the absence of any appropriate written submission from Dr. Mileikowsky regarding patient care and peer review in compliance with my June 11, 2001 Ruling . . . , I will instruct the Hearing Committee that based upon this they may find that the Medical Staff's initiation of peer review of Dr. Mileikowsky's patient care was reasonable and warranted as to those peer review matters where the only charges against Dr. Mileikowsky are that he failed to participate in, cooperate in, or obstructed peer review. [Fn. omitted.] I will issue this instruction when evidence is first presented on such peer review."

### 4. *Hearing Officer's Rulings Re·Lawsuit/Exhibits*

The hearing officer issued rulings pertaining to exhibits in the period before the evidentiary portion of the hearing began. On July 11, 2001, he ruled that the parties should not present documents filed in the lawsuits except for sworn statements relevant to the matters at issue in the hearing and that Dr. Mileikowsky was to submit an organized set of his proposed exhibits and an exhibit list 10 days before the next hearing session. In an August 24, 2001, letter, the hearing officer stated that Dr. Mileikowsky was "in default on my July 11, 2001 Ruling . . . regarding submission of his exhibit list and exhibits by August 6, 2001." In a ruling dated August 28, the hearing officer stated: "Dr. Mileikowsky apparently is choosing to ignore the requirement . . . that all documents expected to be introduced at the hearing must be exchanged at least ten days prior to commencement of the hearing. . . . This default precludes Dr. Mileikowsky from presenting exhibits at the hearing unless and until he presents a request for relief from his default along with an exhibit list and proposed exhibits submitted to the Hearing Officer and the [Hospital]." In a letter dated October 1, the hearing officer reiterated that "Dr. Mileikowsky's continuing failure to seek to cure [defaults with respect to exhibits] is extremely ill advised, and if not corrected quickly will easily have the legal effect of resulting in his concession of the validity of major aspects of the allegations against him."

Dr. Mileikowsky expressed a wish to present as exhibits documents filed in the lawsuit and transcripts of proceedings, primarily to illustrate that the Hospital violated the preliminary injunction granted in case No. BS056525. This was the subject of numerous letters to the hearing officer in which he reiterated his request and berated the hearing officer for denying it. In various letters on this subject, Dr. Mileikowsky accused the hearing officer of "suffer[ing] from . . . delusions"; "express[ing] [his] ignorance of the

subject"; behaving "irresponsibl[y]"; being "out of touch"; failing to "face reality"; and showing "confusion."

In a ruling dated March 14, 2001, the hearing officer stated: "This hearing will not be a forum for Dr. Mileikowsky to present proof of the claims which he is asserting in his pending lawsuits against various members of the Medical Staff at [the Hospital] . . . . Dr. Mileikowsky should not seek to inform the members of the Hearing Committee of his pending lawsuits." On July 11, the hearing officer issued a further ruling that stated: "As explained in my March 14, 2001 Ruling this hearing will not be a forum for Dr. Mileikowsky to litigate his pending lawsuits and he shall not seek to inform the Hearing Committee of the lawsuits." In a letter dated August 24, the hearing officer stated: "I will not change my rulings excluding the submission of court filings from Dr. Mileikowsky's lawsuits, other than relevant sworn statements, as exhibits in this matter."

In a September 13, 2001, ruling, the hearing officer reiterated that the parties should not bring up the lawsuits at the hearing. That order described an attempt by Dr. Mileikowsky to ask questions that implied there had been a violation of a court order by the Hospital with respect to his encounter with a security guard in November 2000. The hearing officer noted that Dr. Mileikowsky reacted emotionally and yelled in reaction to the hearing officer's ruling. The September 13 ruling stated that a recess would be called whenever Dr. Mileikowsky was "out of control" and that sanctions would be imposed if the behavior recurred.

### 5. *Hearing Officer's Rulings Re Contact with the Hearing Committee*

On several occasions during voir dire of potential Hearing Committee members, the hearing officer stated that "[t]he matters that go on within this hearing room are confidential and should stay in the hearing room and not be repeated outside the hearing room. The only things to be said outside the hearing room are, if you're on the hearing committee, the dates of the hearings and where the locations are."

On November 1, 2001, the hearing officer issued a ruling in response to Dr. Mileikowsky's charges that Dr. Wulfsberg and others had improper contacts with the Hearing Committee. Dr. Mileikowsky had stated: "The members of the Hearing Committee are like a jury and it is well known that neither party is supposed to have any ex parte communications with jury members." The hearing officer's response was, among other things: "No evidence has been presented by Dr. Mileikowsky to show that there has been any violation of my admonitions to the Hearing Committee and to the parties

not to have communications with members of the Hearing Committee regarding the substance of these proceedings except in the hearing room" and "it is inevitable that each of the parties to the proceedings . . . and their representatives are in contact with the members of the Hearing Committee. As I have instructed the Hearing Committee, what is important is that there is no communication with members of the Hearing Committee regarding the substance of these proceedings, except in the hearing room."

### 6. Dr. Mileikowsky's Conduct During Hearing Sessions

The hearing commenced in January 2001. Sessions were generally scheduled in the evening, from 6:30 p.m. until 10:00 p.m. Voir dire of potential panel members and other procedural matters consumed seven sessions—which were spread out over many months—and actual substantive matters were not addressed until August 16, 2001, when opening statements were made. Over the course of the next 16 sessions which took place between August and December 2001, the Hospital called witnesses to testify in support of the charges.

Dr. Mileikowsky arrived late at the session on August 28, 2001, and requested a continuance because his physician-assistant was in surgery. He submitted a written motion to bifurcate and argued with the hearing officer about whether he could present it to the Hearing Committee—issues that had already been addressed by the hearing officer. He tried to bring up the related lawsuit. He argued with the hearing officer about whether the hearing officer had the authority to limit examination of witnesses. He argued with the hearing officer when the hearing officer admonished him to ask questions rather than engage in a dialogue. He argued with the hearing officer when the hearing officer questioned the relevance of a line of questioning. At one point, the hearing officer stated that Dr. Mileikowsky seemed to be trying to "provoke something."

At the August 29, 2001, session, Dr. Mileikowsky argued with the hearing officer when the hearing officer interrupted him for badgering a witness. Dr. Mileikowsky attempted to question a witness about the lawsuit and preliminary injunction and argued with the hearing officer when the hearing officer cut off the line of questioning. He interrupted the questioning of a witness to demand production of a patient chart, and referred to the hearing as "the Spanish Inquisition." Dr. Mileikowsky repeatedly criticized the hearing officer for "interrupting" him and for taking the Hospital's side when the hearing officer ruled against him on objections. Similar comments were made at the August 30 session and the September 4 and 5 sessions. At the September 4 session, the hearing officer threatened to suspend questioning if Dr. Mileikowsky did not cease arguing about a ruling. At the September 5

session, the hearing officer admonished Dr. Mileikowsky for intimating that court orders had been violated and for bringing up the litigation. Also on September 5, the hearing officer reminded Dr. Mileikowsky of the ruling concerning the lawsuits and warned him if he persisted in trying to "perpetrate [the] fiction about there being a court order . . . that prohibited people from escorting [him]," the hearing officer would "take steps to precisely inform the [Hearing Committee] of what the true nature of the law was." At the very next session, on September 29, 2001,[11] however, Dr. Mileikowsky attempted to bring up the litigation again.

At the October 22 session, the Hospital introduced a document that purported to summarize the medical cases that triggered the attempted peer review process in 1998. The document had been prepared at the request of the hearing officer since the underlying care of the patients involved was not raised in the charges that led to the termination of staff privileges and was not directly at issue in the hearing. Dr. Mileikowsky had been provided an opportunity to create a document addressing why he believed these cases should not have triggered peer review, but had not done so. Dr. Mileikowsky accused the hearing officer of being out of touch with reality. The hearing officer warned Dr. Mileikowsky that he could adjourn the hearing. After a lengthy discussion, the session was terminated early because Dr. Wulfsberg's continuity with the witness had been disrupted.

The October 23, October 29, and November 1, 2001, sessions were interrupted for argument concerning whether Dr. Mileikowsky could introduce exhibits when he was in default of the Bylaws and the hearing officer's order concerning preparation of an exhibit list and providing copies of proposed exhibits to the Hospital.

Dr. Mileikowsky again attempted to bring up the related litigation and preliminary injunction at the November 5, 2001, session. At that point, Dr. Wulfsberg asked for greater sanctions, such as excusing the witness or stopping the hearing.

At the November 12, 2001, session, there were several periods when questioning was interrupted while Dr. Mileikowsky argued with the hearing officer over rulings. At one point the hearing officer warned Dr. Mileikowsky to stop "[o]r [he] will excuse [Dr. Mileikowsky] from the hearing room."

---

[11] Several hearing sessions scheduled for mid-September were cancelled due to the attack on the World Trade Center on September 11, 2001.

The transcripts reflect that two sessions besides the October 22 sessions were terminated early.[12] The session on November 29, 2001, was terminated by the hearing officer after Dr. Mileikowsky made some foundational objections and complained that he had not received copies of documents being shown to the witness and the panel. The session, which began at around 7:00 p.m., was adjourned at 7:25 p.m.—over Dr. Mileikowsky's objection—so that copies of documents could be supplied to him.[13] On November 30, 2001, the hearing officer issued a ruling noting there had been "repeated instances where Dr. Mileikowsky has disrupted the hearing by yelling and refusing to comply with my rulings" and warning he would "take appropriate action" if the disruptions did not cease. The ruling also noted that Dr. Mileikowsky was often late to arrive and had caused sessions to start late. The ruling further stated that the hearing officer was satisfied that documents at issue on November 29 had been faxed to Dr. Mileikowsky.

The session on December 17, 2001, which began at 6:37 p.m., was adjourned early—at 8:12 p.m.—when Dr. Mileikowsky argued with the hearing officer over objections sustained during Dr. Mileikowsky's cross-examination of a witness testifying concerning the vacuum extraction. For example, Dr. Mileikowsky asked the witness to find something objective on the chart that would document any injury to the baby. The witness referred to "a cephalohematoma." Dr. Mileikowsky interjected that that was not an objective document. The hearing officer told him not to interrupt the witness and to ask a question. A few minutes later the witness said that Dr. Mileikowsky would have to "ask a pediatrician" whether a cephalohematoma could be distinguished from an edema by the speed at which it resolved. Dr. Mileikowsky retorted: "The fact is that you have the hutzpah [sic] to sit here and say that I caused injury . . . and you don't have the knowledge." When the hearing officer told him he was out of order and threatened to adjourn the hearing, Dr. Mileikowsky said that the whole hearing was out of order and that the hearing officer was "ready to adjourn before we started." The hearing officer abruptly adjourned the hearing stating that "Dr. Mileikowsky is refusing to

---

[12] Respondents' brief indicates that "four hearing sessions" were "cut short and/or cancelled" as the result of "Dr. Mileikowsky's disruptive behavior." The brief goes on to cite *three* sessions in addition to the two discussed above—the sessions on September 5, October 29, and December 3, 2001. The session on September 5 commenced at 6:56 p.m. and was ended at 9:42 p.m. by the hearing officer because he thought the members of the Hearing Committee "need to get some sleep." The October 29 session commenced at 7:10 p.m. and ended at 9:45 p.m., which was, according to the hearing officer "beyond the time I said we'd adjourn." The session on December 3 commenced at 7:06 p.m. and ended at 9:49 p.m. after the hearing officer indicated an intention to "take a break to talk about other [matters]."

[13] The Hospital subsequently submitted proof that Dr. Mileikowsky had timely received a copy of the exhibits—a letter from the Hospital to the hearing officer enclosing a copy of a facsimile transmission sheet dated November 19, 2001, and an Airborne Express document indicating that a package had been signed for by Dr. Mileikowsky's receptionist on November 20, 2001.

abide by my ruling . . . regarding no argument." No further evidentiary sessions were held after that date.

### 7. Posthearing Rulings

On December 24, 2001, the hearing officer asked the parties to submit briefs regarding his authority to declare a default based on Dr. Mileikowsky's actions in the following areas: failure to produce documents; failure to prepare an exhibit list and set of exhibits; failure to submit a written statement concerning the peer review allegations; and repeated disruption of hearing sessions by violating orders concerning questioning of witnesses and repeated references to the lawsuits he had filed.

On January 3, 2002, the hearing officer issued a written ruling stating that Dr. Mileikowsky had "acted to disrupt the orderly conduct of [the] hearing on a number of occasions" by refusing "to comply with [the hearing officer's] Rulings regarding the examination of witnesses and the introduction of evidence"; engaging in "noisy yelling at hearing sessions" on September 5, November 29, and December 17, 2001; and making statements containing "invective and personal attacks directed towards witnesses" and others. The hearing officer ruled that further questioning of witnesses on Dr. Mileikowsky's behalf be done by his assistants or representatives, that the hearings be videotaped, and that a security officer be present in the hearing room. He stated that "[t]he hearing sessions shall not reconvene until Dr. Mileikowsky responds in writing that he will comply with my rulings regarding the conduct of this hearing, including specifically the rules set forth in this Ruling."

A few days later, the hearing officer postponed a scheduled session because Dr. Mileikowsky had sent him a letter indicating he would not abide by the ruling concerning the examination of witnesses, and that he would like to have his own videotape technician and security guard in the room.

On February 19, 2002, the hearing officer reiterated in a written ruling that "the 'hearing sessions shall not reconvene until Dr. Mileikowsky responds in writing that he will comply with my rulings regarding the conduct of this hearing, including specifically the rules set forth in' [the] January 3, 2002 Ruling."

On March 1, 2002, the hearing officer asked the parties to submit a written brief on the issue of whether Dr. Mileikowsky had abandoned his defense of the matter by refusing to state that he would comply with the rulings regarding future proceedings or whether other procedures should be followed. Dr. Mileikowsky prepared a brief, sending it not just to the hearing officer and Dr. Wulfsberg, but also to the members of the Hearing Committee. The

brief stated that the hearing officer had ruled that questioning of witnesses on Dr. Mileikowsky's behalf had to be conducted by one of his representatives. An attached letter from his two representatives stated that they did not feel qualified to provide the kind of representation that the hearing officer's ruling demanded.

On March 19, 2002, a member of the Hearing Committee reportedly called the Hospital and said "[the hearing officer's] request to deny [Dr. Mileikowsky] from questioning witnesses is outrageous, absolutely outrageous, to change in the middle of the . . . procedure . . . is an outrageous thing to do." Attorneys representing the Hospital sent a letter claiming that "The statements . . . contained in Dr. Mileikowsky's . . . brief are so inflammatory, false and misleading that there is no way this [hearing] can be rehabilitated," and asked the hearing officer to rule that he had "failed to proceed . . . in good faith and has therefore waived his rights to hearing and an appellate review."

### 8. *Hearing Officer's Order Terminating Proceedings*

On March 30, 2002, the hearing officer issued a ruling formally terminating the hearing sessions, stating that "[t]he intentional acts of misconduct by Dr. Mileikowsky have so prejudiced the hearing that it is impossible to complete it consistent with the requirements of fair procedure and due process imposed by California law" and that "Dr. Mileikowsky's repeated acts of misconduct at this hearing have created a situation where he has waived his right to the completion of this hearing and thereby has failed to exhaust his administrative remedies."

According to the ruling, the primary basis for the decision to terminate was the letter Dr. Mileikowsky wrote to the members of the Hearing Committee, which the hearing officer deemed "unauthorized" and "an obvious attempt to prejudice their consideration of the matters before them." The hearing officer referred to his November 1, 2001, ruling wherein it was reportedly stated that "the Hearing Committee have no communication 'regarding the substance of these proceedings, except in the hearing room' " and that " 'the parties not . . . have communications with members of [the] Hearing Committee regarding the substance of these proceedings, except in the hearing room.' " In addition, the hearing officer accused Dr. Mileikowsky of misinforming the Hearing Committee in his letter by indicating that no one would be able to question witnesses on Dr. Mileikowsky's behalf. As evidence of prejudice from these actions, the hearing officer stated: "At least one Hearing Committee member is reported to have been outraged by my purported refusal to allow any representative of Dr. Mileikowsky to question witnesses."

The second basis was Dr. Mileikowsky's conduct with respect to his related lawsuit. The hearing officer stated: "Since I wished to have the Hearing Committee use its own judgment without reference to inconclusive legal proceedings, I ruled that the lawsuits should not be referenced in the Medical Staff hearing" in order to "protect Dr. Mileikowsky from prejudice and confusion[.] [H]e violated my rulings by continuously making reference to his lawsuits in front of the Hearing Committee and by misrepresenting the rulings in his lawsuits."

The third basis was Dr. Mileikowsky's violation of orders regarding discovery in June and July 2001. The ruling particularly referenced documents related to the decision of Cedars-Sinai to terminate his medical staff privileges, and calendars and appointment books that would have indicated Dr. Mileikowsky's whereabouts when he avoided appearing at peer review investigations.

The fourth basis was failure to produce copies of exhibits expected to be introduced at the hearing 10 days before the commencement of the hearing in July 2001.

The fifth basis was Dr. Mileikowsky's failure to submit any briefing concerning the allegations that he failed to cooperate in peer review.

The sixth basis was Dr. Mileikowsky's conduct in disrupting hearing sessions by allegedly "yelling, . . . disobeying [the hearing officer's] rulings regarding the questioning of witnesses, and . . . misrepresenting whether he received documents which [we]re the subject of a particular hearing." By way of example, the hearing officer referenced the September 5, 2001, session, where Dr. Mileikowsky "disrupted the proceedings because he disagreed with [the hearing officer's] prohibition of his reference to his litigations in front of the Hearing Committee" and the session on November 29, 2001, where he "disrupted [a session] by falsely contending that he had not received a . . . letter . . . enclosing exhibits." The ruling further specifically described the December 17, 2001, session as one in which Dr. Mileikowsky engaged in "disorderly conduct and disruption of hearings."

The seventh basis was Dr. Mileikowsky's use of language in written and oral statements that "abuse[d] witnesses, the MEC's representatives, hospital administrators, and [the hearing officer]." For example, at the December 17, 2001, session, Dr. Mileikowsky called a witness "superficial and careless," stated that " '[the witness didn't] have the knowledge,' " and had an " 'interest to see that [Dr. Mileikowsky's] practice goes down the tube.' " In a letter to the hearing officer, Dr. Mileikowsky accused an attorney for the MEC of

"fabrications." In another letter, Dr. Mileikowsky said of the hearing officer that he "lie[s] by omission" and "[s]uffer[s] from the same delusions as [the MEC attorney]."

Finally, the hearing officer pointed to Dr. Mileikowsky's "continuing refusals to obey my rulings for the conduct of this hearing" evidenced at the December 17, 2001, session and in the letters that followed.

### D. Administrative Appeal

The hearing officer's decision to terminate was appealed to another three-person appellate review body. The appellate review body affirmed, concluding that Dr. Mileikowsky "repeatedly disrupted hearing sessions and used personal invective and threatening language"; "repeatedly violated the Hearing Officer's order that he refrain from referencing his two lawsuits brought against [the Hospital's] parent company and many Medical Staff physicians"; "refused to comply with Discovery required by [Business and Professions Code Code] Section 809 and the [Bylaws]"; and "entered into unauthorized ex parte communications with the entire Hearing [Committee] relating to the subject matter of the Hearing."

### E. Dr. Mileikowsky's Writ Petition

After exhausting his administrative remedies, Dr. Mileikowsky filed a petition for writ of mandate in the superior court. In his first amended petition,[14] Dr. Mileikowsky alleged that after the related lawsuit was filed and a preliminary injunction issued prohibiting the Hospital from preventing Dr. Mileikowsky from exercising the privileges of an active status physician and surgeon or reporting to others that he had voluntarily resigned, the Hospital "purported to process [his] application in accordance with [its] By-Laws" but voted to deny it without hearing or notice. Dr. Mileikowsky alleged that he appealed the decision, and an administrative hearing commenced in October 2000. Then, in November, the Hospital "blatantly violated once again the preliminary injunction [in case No. B159733] by purporting to summarily suspend [Dr. Mileikowsky's] privileges on November 16, 2000." The Hospital upheld the summary suspension "in violation of the By-Laws, in violation of the preliminary injunction, and in violation of the due process clauses of the federal and state [C]onstitutions." Thereafter, the Hospital "purported to provide [Dr. Mileikowsky] with a combined hearing regarding his reappointment application and the summary denial of his staff privileges with a new Hearing Officer and a new Hearing Committee." That hearing was

---

[14] The original petition is not in our record.

"illegally suspended on March 30, 2002 by [the hearing officer], who failed to obtain the approval of the [Hearing] Committee."

The petition sought a new administrative hearing, and also asked that the hearing officer be appointed by the court or, alternatively, that the hearing be conducted entirely by the court.

### F. *Trial Court's Ruling*

At the hearing on the petition, the trial court stated that the hearing officer's decision came to it with a "presumption of correctness" and that Dr. Mileikowsky had not met his burden of showing that the decision was not supported by the weight of the evidence. The court made particular reference to "one instance . . . where the reporter who was reporting [the hearing] threw up her hands and walked out because [Dr. Mileikowsky] kept interrupting, [and] she could not make any kind of an intelligible transcript of what was going on" and another where Dr. Mileikowsky "was shouting at people, [and] insisting on reading into the record a . . . ruling [the court] had made that was not relevant to any point being discussed at the time."

The court denied the writ petition on March 14, 2003. We quote from the court's order explaining its reasoning at length: "The administrative hearing was terminated based upon findings that [Dr. Mileikowsky] had repeatedly disrupted the hearings by disorderly conduct, defiance of the hearing officer's rulings made to control [Dr. Mileikowsky's] conduct, violation of the hearing officer's rulings concerning the admissibility of evidence, refusal of [Dr. Mileikowsky] to provide information requested from him relating to the charges against him despite orders by the hearing officer to do so, and [Dr. Mileikowsky's] repeated failure and refusal to obey orders of the hearing officer concerning the filing of briefs.

"The administrative record contains substantial evidence to support the administrative decision, and, under the circumstances, the court finds that the termination of the administrative hearing was not arbitrary or capricious, and was not an abuse of discretion by the governing board.

"The administrative decision was the culmination of a long course of disruptive conduct by [Dr. Mileikowsky] since his application for staff privileges was initially denied on January 11, 2000. The administrative hearings have produced an administrative record that now fills ten cartons which, placed one on top of another, constitute a stack of documents almost nine feet high. [Dr. Mileikowsky] has been given more than an adequate opportunity to oppose administratively respondent's efforts to rid itself of his presence upon its medical staff. He is entitled to no more."

Judgment was entered on respondents' behalf. Dr. Mileikowsky moved for a new trial based on insufficient evidence to support the court's decision. The motion was denied. This appeal followed.

## DISCUSSION

## I

### *Standard of Review*

The parties dispute the standard of review to be applied on appeal. Dr. Mileikowsky contends that we should examine the issues raised de novo. The Hospital insists that the rulings of the hearing officer and administrative review body must be upheld as long as they are supported by substantial evidence. In addition, the parties are in disagreement over whether the writ was properly taken under Code of Civil Procedure section 1085 (traditional or ordinary mandamus) or section 1094.5 (administrative mandamus).[15]

The parties' confusion is understandable. There are two distinct issues embedded in the seemingly simple question of whether to uphold the hearing officer's decision: (1) whether the hearing officer had the authority to suspend the hearing as a sanction under the Hospital's Bylaws and/or the provisions of the Business and Professions Code governing termination of physicians' hospital staff privileges; and (2) whether the administrative record supports the conclusion that Dr. Mileikowsky's conduct justified terminating the proceeding. A different standard of review applies to each issue.

■ The first essentially asks whether Dr. Mileikowsky was afforded the hearing required by the Business and Professions Code and the Bylaws. Failure to provide a hearing required by law or regulation is remedied by a petition for traditional mandate, as this court stated in *DeCuir v. County of Los Angeles* (1998) 64 Cal.App.4th 75 [75 Cal.Rptr.2d 102]. There, the civil service commission had refused to hold a hearing and made a decision based on review of written materials. The claimant contended he was excused from seeking review by way of ordinary mandate. We disagreed: "The commission's denial of a hearing is itself a reviewable determination. That was the context in which [the claimant's] claim was presented and reviewed. The fact that [the claimant] did not prevail does not establish that a petition for

---

[15] As explained in *Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 848 [41 Cal.Rptr.2d 567]: "Statutes provide for two types of review by mandate: ordinary mandate and administrative mandate. [Citation.] The nature of the administrative action or decision to be reviewed determines the applicable type of mandate. [Citation.] In general, quasi-legislative acts are reviewed by ordinary mandate and quasi-judicial acts are reviewed by administrative mandate."

ordinary mandate will automatically fail. . . . [M]andate is not only available to review the action of the commission where there is a hearing, but is the appropriate procedure to test the commission's denial of a hearing." (*Id.* at p. 82.)

█ Moreover, determining whether hearing procedures complied with the relevant statutes and the Bylaws requires application of the rules of statutory interpretation and construction. In such cases, " '[t]he appropriate mode of review . . . is one in which the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction. [Citation.]' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) Despite the deference given, "[t]he court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued." (*Id.* at p. 11, fn. 4.)

█ *Yamaha* dealt with interpretation of the underlying statute. The same standard applies to appellate review of an administrative body's interpretation of its own regulations: "As a general rule, the courts defer to the agency charged with enforcing a regulation when interpreting a regulation because the agency possesses expertise in the subject area. [Citation.] However, final responsibility for interpreting a statute or regulation rests with the courts and a court will not accept an agency interpretation which is clearly erroneous or unreasonable." (*Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 28 [285 Cal.Rptr. 515].)

█ The conclusion that traditional mandamus applies and review is de novo in situations similar to the present case was reached by the court in *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607 [113 Cal.Rptr.2d 309], where the physician contended that the respondent hospital's medical staff Bylaws did not properly implement the provisions of the Business and Professions Code and that the notice given to him did not comply with the requirements of statute. (*Id.* at p. 618.) The court concluded that the physician based his challenge on the failure of respondents to comply with law, and that therefore, review would be under standards of traditional mandamus. (*Ibid.*) The court further recognized that "[i]n reviewing a trial court's ruling on a writ of mandate, an appellate court is 'ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. [Citation.]' " (*Ibid.*) However, where the duty the petitioner seeks to enforce "is one derived from statute," and the question presented is "what does the statute require," the appellate court is "confronted with questions of law only, [and is] to address the legal issues de novo." (*Id.* at pp. 618–619.)

■ Similarly, in *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434 [282 Cal.Rptr. 819], the physician filed a petition for writ of mandate seeking to reinstate his hospital staff privileges, primarily raising procedural issues such as whether he had sufficient notice of the charges against him and whether he had a meaningful opportunity to voir dire panel members. The court interpreted the question presented as "whether there was a fair trial and whether the [hospital] proceeded in a manner required by law." (*Id.* at p. 1443.) Findings by the trial court as to these types of matters represented "conclusion[s] of law," and were to be reviewed "de novo" by the appellate court based on independent review of the administrative record. (*Id.* at pp. 1442–1444.)

■ Once it is resolved whether hearing officers have the power under the statute and regulations to impose the equivalent of terminating sanctions, however, the issue becomes whether such sanctions should have been imposed in a particular case. Applying the law to a particular factual situation is a judicial or quasi-judicial function. Section 1094.5 of the Code of Civil Procedure is the provision that governs review of quasi-judicial administrative decisions. (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 123 [109 Cal.Rptr. 799, 514 P.2d 111].) The scope of review under section 1094.5 was laid out by the Supreme Court in *Selby Realty Co. v. City of San Buenaventura*: "Subdivision (b) of section 1094.5 of the Code of Civil Procedure provides that the scope of inquiry in a mandamus proceeding brought to inquire into the validity of a final administrative order shall extend to whether the respondent has proceeded without or in excess of jurisdiction, whether there was a fair trial, and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the decision is not supported by the findings, or the findings are not supported by the evidence." (10 Cal.3d at pp. 123–124.)

■ Our review of the issue of whether Dr. Mileikowsky's behavior warranted the sanction imposed is not resolved, however, by a determination of whether "the [administrative review body's] findings of fact are supported by substantial evidence," as respondents contend. Neither the appellate review body nor the Hearing Committee made any findings of fact based on the evidence presented with respect to the substantive charges against Dr. Mileikowsky. The "facts" on which the hearing officer relied to impose sanctions are better described as the procedural background, which is found in the administrative record and is not subject to serious dispute. Like a trial court confronted with a litigant who repeatedly disobeys court orders, the hearing officer exercised discretion in choosing how to respond. The question of whether the ultimate sanction should have been imposed is subject to the same standard of review as our review of a trial court's order imposing

similar sanctions on a litigant: abuse of discretion. (See, e.g., *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 108 [8 Cal.Rptr.3d 699].)[16]

## II

### *Hearing Officer's Authority*

"In 1989, the state Legislature enacted California Business and Professions Code section 809 et seq. for the purpose of opting out of the federal Health Care Quality Improvement Act of 1986 [citation], which was passed to encourage physicians to engage in effective peer review. California chose to design a peer review system of its own, and did so with the enactment of these sections. [Citation.] Section 809 provides generally that peer review, fairly conducted, is essential to preserving the highest standards of medical practice and that peer review which is not conducted fairly results in harm both to patients and healing arts practitioners by limiting access to care. [Citation.] The statute thus recognizes not only the balance between the rights of the physician to practice his or her profession and the duty of the hospital to ensure quality care, but also the importance of a fair procedure, free of arbitrary and discriminatory acts." (*Unnamed Physician v. Board of Trustees*, *supra*, 93 Cal.App.4th at pp. 616–617, fn. omitted.)

Section 809 et seq. of the Business and Professions Code "delegates to the private sector the responsibility to provide fairly conducted peer review in accordance with due process, including notice, discovery and hearing rights" and "also defines what constitutes minimum due process requirements for the review process." (*Unnamed Physician v. Board of Trustees*, *supra*, 93 Cal.App.4th at p. 622.) "The statute allows for and encourages effective peer review, while at the same time it balances the interests of both the physician and the public in ensuring fair, nonarbitrary, and nondiscriminatory procedures. [Citations.] It does this by defining the minimum procedures required and by mandating strict compliance with the procedures outlined." (*Ibid.*)

Business and Professions Code section 809.2 sets forth the statutory requirements for hearing procedures. Under subdivision (a), the hearing is to be held either before an arbitrator or "a panel of unbiased individuals." Subdivision (b) provides that a hearing officer may be "selected to preside at a hearing held before a panel" and "shall not be entitled to vote." The practitioner has the right to voir dire panel members and to challenge the

---

[16] Our conclusion in this regard is supported by the Seventh Circuit's decision in *Chapman v. U.S. Commodity Futures Trading Commission* (7th Cir. 1986) 788 F.2d 408.) In affirming an agency decision to dismiss a proceeding due to failure to comply with a discovery order, the court said: "As this agency sanction was within statutory limits, it can be upset only if it reflects an abuse of discretion." (*Id.* at p. 411.)

impartiality of such members. Challenges are to be ruled on by "the presiding officer, who shall be the hearing officer if one has been selected." (Bus. & Prof. Code, § 809.2, subd. (c).)

Under subdivision (d) of Business and Professions Code section 809.2, the parties have the right to inspect and copy documents relevant to the charges and "[t]he failure by either party to provide access to this information at least 30 days before the hearing shall constitute good cause for a continuance." "The . . . presiding officer [that is, the hearing officer where one has been selected] shall consider and rule upon any request for access to information, and may impose any safeguards the protection of the peer review process and justice requires." (*Id.*, subd. (d).)

Under subdivision (f) of Business and Professions Code section 809.2, the parties are to "exchange lists of witnesses expected to testify and copies of all documents expected to be introduced at the hearing." "Failure to disclose the identity of a witness or produce copies of all documents expected to be produced at least 10 days before the commencement of the hearing shall constitute good cause for a continuance." (*Id.*, subd. (f).) Continuances may be granted "by the . . . presiding officer on a showing of good cause." (Bus. & Prof. Code, § 809.2, subd. (g).)

Subdivision (h) of Business and Professions Code section 809.2 requires a hearing to commence within 60 days after receipt of a request for hearing and to be completed "within a reasonable time, after a licentiate receives notice of a final proposed action or an immediate suspension or restriction of clinical privileges," unless the "presiding officer issues a written decision finding that the licentiate failed to comply with subdivisions (d) and (e) in a timely manner, or consented to the delay."

Finally, Business and Professions Code section 809, subdivision (a)(8) requires promulgation of "written provisions implementing Sections 809 to 809.8" to be included "in medical staff bylaws." And section 809.6, subdivision (a) provides that "[t]he parties are bound by any additional notice and hearing provisions contained in any applicable professional society or medical staff bylaws which are not inconsistent with Sections 809.1 to 809.4, inclusive."

As we have seen, the Hospital did promulgate Bylaws that add further detail to the statutory procedures. Among other things, the Bylaws mandate rather than permit the appointment of a hearing officer "to preside at the evidentiary hearing." (Bylaws, art. VIII, § 3.D.) In line with the powers expressly granted by statute to the "presiding officer," the hearing officer is empowered to rule on challenges for bias (*id.*, § 3.F) and disputes regarding

access to documents and other information (*id.*, § 3.G), and grant continuances (*id.*, § 3.I). In addition, "[t]he hearing officer shall act to maintain decorum and to assure that all participants in the hearing have a reasonable opportunity to present relevant oral and documentary evidence. He/she shall be entitled to determine the order of procedure during the hearing and shall make all rulings on matters of procedure and the admissibility of evidence." (Bylaws, art. VIII, § 4.B.) Finally, article VIII, section 3.G provides that disputes regarding requests for access to documents shall be submitted to the hearing officer "who may impose any safeguards deemed necessary" in the interests of fairness and to protect the peer review process.

The Bylaws also list various ways in which a practitioner can be deemed to have waived his or her right to a hearing. A waiver can occur if the practitioner fails to request a hearing "within the time and in the manner specified." (Bylaws, art. VIII, § 2.E.) Under article VIII, section 4.A, a hearing can be waived by "[a] practitioner who fails without good cause to appear and proceed" at the hearing. In addition, article VIII, section 10.C provides that if after receipt of a notice of adverse recommendation or action, "a practitioner fails to make a required request or appearance or otherwise fails to comply with this Fair Hearing Plan or to proceed with the matter," he or she "shall be deemed to have consented to such adverse recommendation, action or result and to have voluntarily waived all rights to which he might otherwise have been entitled under the medical staff bylaws then in effect or under this Fair Hearing Plan with respect to the matter involved."

Noting that nothing in these provisions expressly permits the hearing officer to suspend the hearing based on the practitioner's conduct in disobeying orders or disrupting hearing sessions, Dr. Mileikowsky and amicus curiae Union contend that the hearing officer exceeded his authority and violated Dr. Mileikowsky's right to a hearing before his peers. Respondents concede that the power to terminate proceedings is not expressly set forth in the Bylaws or the relevant statutes, but contend that such power is reasonably inferable from existing provisions or the inherent power of a judicial or quasi-judicial officer.

 As we have said, our responsibility is to interpret the governing statutes and regulations with due deference to the appellate review body's interpretation. (See, e.g., *Aguilar v. Association for Retarded Citizens, supra,* 234 Cal.App.3d at p. 28.) "To determine the intent [of a statute or regulation], the court turns first to the words, attempting to give effect to the usual, ordinary import of the language and to avoid making any language mere surplusage. [Citations.] The words must be construed in context in light of the nature and obvious purpose of the regulation where they appear. [Citation.] The various parts of an enactment must be harmonized in context of the framework as a whole. [Citations.] The regulation [or statute] must be given a

reasonable and common sense interpretation consistent with the apparent purpose and intention of the agency, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity." (*Id.* at pp. 28–29.)

 Although the Business and Professions Code does not specifically speak in terms of termination of proceedings or waiver of rights, section 809.2, subdivision (h), expressly relieves hospitals of their obligation to commence a hearing "within 60 days after receipt of the request" or complete a hearing "within a reasonable time" where the practitioner fails to comply with subdivisions (d) and (e) pertaining to discovery. In addition, the statute contemplates that hearings will have a "presiding officer" who will render rulings on procedural matters and "may impose any safeguards the protection of the peer review process and justice requires." (Bus. & Prof. Code, § 809.2, subd. (d).) The statutes further contemplate that hospitals will promulgate Bylaws to implement the statutory provisions that will be binding on the parties. (*Id.*, § 809.6.)

The Bylaws go into greater detail concerning the various ways in which rights may be waived. Article VIII, section 10.C, in particular, is quite broad—any failure to comply with the Fair Hearing Plan outlined in the Bylaws may be deemed a waiver of the right to contest the adverse action. In its April 2001 ruling reversing the decision to terminate the previous hearing, the appellate review body noted that article VIII, section 10.C of the Bylaws "provides the basis for waiver of rights under the Bylaws in a broad range of circumstances."

The hearing officer's conclusion that he had the power to suspend the hearing based on the conduct of the practitioner is in line with the relevant statutes and the Bylaws as interpreted by the appellate review body. His decision that the rules permit termination of a hearing when the practitioner is repeatedly disruptive, disdainful of the hearing officer's authority, and flagrantly violates the rules pertaining to discovery and documentary exhibits was not "clearly erroneous" or "unreasonable," and was affirmed by the appellate review body. (See *Aguilar v. Association for Retarded Citizens*, *supra*, 234 Cal.App.3d 21.) We see no basis for reaching a contrary interpretation.

 Moreover, even if the power to control proceedings was not specifically enunciated in the relevant statutes and Bylaws, hearing officers have "wide latitude as to all phases of the conduct of the hearing, including the manner in which the hearing will proceed. [Citations.]" (*Cella v. United States* (7th Cir. 1953) 208 F.2d 783, 789.) Administrative agencies are " 'free to fashion their own rules of procedure and to pursue methods of inquiry

capable of permitting them to discharge their multitudinous duties.' " (*Ibid.*, quoting *Federal Communications Comm. v. Pottsville Broadcasting Co.* (1940) 309 U.S. 134, 143 [84 L.Ed. 656, 60 S.Ct. 437], accord, *Fairbank v. Hardin* (9th Cir. 1970) 429 F.2d 264, 267.) The pronouncements are in accord with the fundamental rule that judges have "inherent power to control litigation before them." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [67 Cal.Rptr.2d 16, 941 P.2d 1203].) In order to ensure that the hearings mandated by the Business and Professions Code proceed in an orderly fashion, hearing officers must have the power to control the parties and prevent deliberately disruptive and delaying tactics. The power to dismiss an action and terminate the proceedings is an important tool that should not be denied them.

Our conclusion that a hearing officer may terminate a hearing as a sanction for flagrant disobedience to orders is supported by the case of *Metadure Corp. v. United States* (1984) 6 Cl.Ct. 61. The case involved a hearing before the Armed Services Board of Contract Appeals (Board). Its regulations stated that "[i]f any party fails or refuses to obey an order issued by the Board, the Board may then make such order as it considers necessary to the just and expeditious conduct of the appeal.[17]" (6 Cl.Ct. at p. 66, fn. 3, quoting 32 C.F.R. App. A, at 435 (1982).) The administrative law judge directed the plaintiff to provide access to its books and records. The order was not complied with, and the administrative law judge imposed a sanction of dismissal. Plaintiff argued before the Court of Claims that the sanction was arbitrary and capricious. The court noted that, just as a court enjoys "inherent power enabl[ing] it to invoke dismissal as a sanction in situations involving disregard of orders" and "great leeway in formulating orders to control discovery," the Board's administrative law judges "by virtue of their case management authority, are given broad discretion to manage the litigation on their dockets." (6 Cl.Ct. at pp. 66–67.) In the case before the court, the administrative record consisted "primarily of voluminous submissions dealing with a major discovery dispute concerning not the nature or scope of discovery, but whether plaintiff would allow discovery to be completed" resulting in "[s]quandering the resources of the administrative tribunal" and "unfair[ness] to other litigants." (*Id.* at p. 67.) Consequently, the court had no difficulty holding that "the administrative law judge acted well within his authority in imposing a preclusionary sanction . . . because of plaintiff's willful failure to comply with the . . . order." (*Id.* at p. 68.)

Dr. Mileikowsky argues alternatively that the decision to terminate the hearing should have been made by the Hearing Committee rather than the hearing officer acting alone. As can be seen from the above-quoted provisions, nothing in the Bylaws or relevant statute suggests that the Hearing

---

[17] Hearings before the Board were referred to as "appeals."

Committee rather than the presiding officer or hearing officer is to decide procedural questions. To the contrary, the provisions we have quoted uniformly indicate that procedural matters are addressed to the presiding officer or hearing officer. The alternative that Dr. Mileikowsky advocates—that contested procedural issues be argued to and decided by the Hearing Committee—is simply unworkable. The panel assembled in the present case consisted of busy medical practitioners. The record reflects the difficulty experienced in convening evidentiary hearing sessions two or three evenings a week for a few hours at a time due to the conflicting schedules of all concerned. If such panels were to be charged with determining procedural matters in addition to the difficult substantive questions, there would be little hope of having these types of proceedings resolved in any reasonable time.

We acknowledge the concern expressed by amicus curiae Association that too much power in the hands of the hearing officer could lead to the loss of the statutorily-mandated peer review. The Association fears that a hearing officer might be tempted to impose terminating sanctions when a difficult defending physician appears to be scoring points with the peer committee. Moreover, the Association points out, the Bylaw's prohibition on representation by legal counsel during the hearing session guarantees that there will be some deviance from standard litigation practices and courtesies. But our recognition of a hearing officer's *authority* to impose the ultimate sanction does not mean that termination of hearings will be routine or that gratuitous impositions will be upheld. Hearing officer decisions to terminate proceedings due to the alleged violation of procedural rules will always be reviewable in court. Courts are reluctant to deprive a litigant of the opportunity to have the substantive merits of his or her case be heard except in egregious circumstances. An extensive record of misbehavior would have to exist to justify a decision to deprive a practitioner of the peer review afforded by statute. It is to the issue of whether the decision to terminate the hearing was justified by the record in the present situation that we now turn.

## III

### *Appropriateness of Terminating Sanction*

As we have seen, the hearing officer gave eight reasons for imposing a terminating sanction: (1) the brief Dr. Mileikowsky addressed to the members of the Hearing Committee; (2) Dr. Mileikowsky's continuous references to his lawsuit and misrepresentations concerning the rulings made; (3) Dr. Mileikowsky's violation of orders regarding discovery; (4) Dr. Mileikowsky's failure to exchange his exhibits 10 days before the commencement of the hearing sessions; (5) Dr. Mileikowsky's failure to submit any briefing concerning the allegations that he failed to cooperate in

peer review; (6) Dr. Mileikowsky's conduct in disrupting hearing sessions by yelling and disobeying the hearing officer's ruling regarding the questioning of witnesses, and misrepresenting whether he received documents; (7) Dr. Mileikowsky's use of abusive or inappropriate language in written and oral statements; and (8) Dr. Mileikowsky's general refusals to obey the hearing officer's rulings for the conduct of the hearing.

In affirming the ruling, the appellate review body focused on four of the reasons given: (1) that Dr. Mileikowsky repeatedly disrupted hearing sessions and used personal invective and threatening language; (2) that he repeatedly violated the hearing officer's order that he refrain from referencing his related lawsuit; (3) that he refused to comply with discovery required by Business and Professions Code section 809 and the Bylaws; and (4) that he entered into unauthorized "ex parte" communications with the entire Hearing Committee.

Dr. Mileikowsky and amicus curiae Association focus on the first reason expressed by the hearing officer, and contend that sending the post-hearing brief to the members of the Hearing Committee was not improperly ex parte because it was served on both sides. It is clear from the context that the hearing officer was not motivated by the belief that the brief had not been served on the other side. After the final hearing session on December 17, 2001, the hearing officer asked for briefing on the issues of appropriate sanctions short of termination and for suggestions on how hearing sessions could proceed in an orderly fashion in the future. After receiving the parties' briefs, the hearing officer made a ruling on how further sessions would proceed. Dr. Mileikowsky was openly defiant and made clear that he did not intend to accede to the hearing officer's ruling. The hearing officer then asked for briefing on whether Dr. Mileikowsky's refusal to proceed under the rules laid down represented a waiver. Dr. Mileikowsky attempted to circumvent him by addressing his response directly to the Hearing Committee. The hearing officer had previously ruled that procedural issues were to be addressed to him alone, and repeatedly refused Dr. Mileikowsky's numerous requests that he be allowed to petition the Hearing Committee for review of procedural rulings. The hearing officer was outraged about the brief not because it was "ex parte," but because it represented a flagrant disregard of prior rulings and confirmed Dr. Mileikowsky's cavalier attitude toward the authority of the hearing officer.

It is important to keep in mind that the hearing officer's final series of requests for briefing on appropriate sanctions and hearing procedures represented the culmination of numerous prior attempts to induce Dr. Mileikowsky to respect the hearing officer, the hearing process, and the requirements imposed on him by the statutes and Bylaws. Dr. Mileikowsky had repeatedly

failed to supply documents requested and had already suffered lesser sanctions as a result. He had failed to supply an exhibit list or copies of exhibits he intended to use, and had been forbidden to introduce exhibits until he complied with the rules pertaining to exchange of exhibits. In defiance of that order, he repeatedly attempted to show new documents to witnesses and was argumentative when reminded of the hearing officer's ruling. Seeking to gain control over the issues, the hearing officer had asked the parties to provide written statements to be distributed to the Hearing Committee with respect to the medical files underlying the charges that Dr. Mileikowsky failed to cooperate with peer review. Dr. Mileikowsky disregarded that request. Dr. Mileikowsky repeatedly attempted to bring up the related lawsuit when cross-examining witnesses to create the impression that court orders had been violated, and was argumentative with the hearing officer when he was cut off. Indeed, Dr. Mileikowsky's habitual response to adverse evidentiary rulings was to argue, accuse the hearing officer of bias, or make contemptuous comments about the hearing officer and/or the hearing process.

As we have said, courts are reluctant to approve imposition of the ultimate sanction unless it is clear from the record that the transgressing party left no viable alternative. In *Newland v. Superior Court* (1995) 40 Cal.App.4th 608 [47 Cal.Rptr.2d 24], this court explained why: "The rule that a sanction order cannot go further than is necessary to accomplish the purpose of discovery is some 35 years old in California, and is rooted in constitutional due process." (*Id.* at p. 613, citing *Caryl Richards, Inc. v. Superior Court* (1961) 188 Cal.App.2d 300 [10 Cal.Rptr. 377].) In *Caryl Richards*, the defendant failed to adequately respond to discovery about the chemical properties of its product even after being ordered to do so. The trial court ordered that defendant's answer be stricken and its default entered. The appellate court in *Caryl Richards* reversed, and we quoted and adopted its reasoning in *Newland*: " 'While under the statute the court undoubtedly has the power to impose a sanction which will accomplish the purpose of discovery, when its order goes beyond that and denies a party any right to defend the action or to present evidence upon issues of fact which are entirely unaffected by the discovery procedure before it, it not only abuses its discretion but deprives the recalcitrant party of due process of law. "The fundamental conception of a court of justice is condemnation only after hearing. To say that courts have inherent power to deny all right to defend an action and to render decrees without any hearing whatever is, in the very nature of things, to convert the court exercising such an authority into an instrument of wrong and oppression, and hence to strip it of that attribute of justice upon which the exercise of judicial power necessarily depends." ' " (*Newland, supra*, at p. 614, quoting *Caryl Richards, supra*, at p. 305.)

Numerous other appellate courts have held that imposition of a terminating sanction by the trial court is excessive where the party's conduct is not extreme and other options were available to protect the integrity of the litigation process. (See, e.g., *Midwife v. Bernal* (1988) 203 Cal.App.3d 57, 64 [249 Cal.Rptr. 708] ["Constitutional due process 'imposes limitations on the power of courts, even in aid of their own valid processes, to order discovery sanctions that deprive a party of his opportunity for a hearing on the merits of his claim' "]; *Thomas v. Luong* (1986) 187 Cal.App.3d 76, 81 [231 Cal.Rptr. 631] [holding that courts "should not deprive a party of all right to defend an action if the discriminating imposition of a lesser sanction will serve to protect the legitimate interests of the party harmed by the failure to provide discovery"]; *Morgan v. Ransom* (1979) 95 Cal.App.3d 664, 670 [157 Cal.Rptr. 212] [court held that the "sanction of peremptory dismissal, without consideration of the merits, is fundamentally unjust unless the conduct of a plaintiff is such that the delinquency interferes with the court's mission of seeking truth and justice"].)

There is no question, however, that in some egregious circumstances terminating sanctions are appropriate. In *Collisson & Kaplan v. Hartunian* (1994) 21 Cal.App.4th 1611 [26 Cal.Rptr.2d 786], for example, the defendants failed to respond to discovery, failed to respond to letters requesting responses, and disregarded a court order issued in a hearing on a motion to compel. After the trial court granted a request for sanctions by striking the answer, the defendants served responses and moved for reconsideration, claiming that the sanction was too drastic since it was only their first effort at drafting responses. The Court of Appeal rejected that argument: "Defendants' characterization of their further responses as being their 'first effort' to respond, while literally correct, is nonetheless misleading. The point that defendants fail to acknowledge is that, while this may have been their first [attempt] to respond, it was not plaintiff's first [attempt] at receiving straightforward responses. Defendants chose to ignore the many attempts, both formal and informal, made by plaintiff to secure fair responses from them. Accordingly, we find no abuse of discretion by the trial court." (*Id.* at p. 1618.)

In *Lang v. Hochman* (2000) 77 Cal.App.4th 1225 [92 Cal.Rptr.2d 322], the court reviewed cases where terminating sanctions were upheld, and discerned the following basic scenario: "[T]he trial court imposed a terminating sanction after considering the totality of the circumstances: conduct of the party to determine if the actions were willful; the detriment to the propounding party; and the number of formal and informal attempts to obtain the discovery. In each case, the offending party spent months avoiding or evading discovery." (*Id.* at p. 1246.) The same pattern appeared in the case before the court in *Lang*. The history of this case showed that "[defendant] did not comply with the court's orders. The referee viewed [defendant's] constant declarations that it fully complied with the discovery request as 'disingenuous at best.' The

referee and the court found [defendant's] lack of diligence to be willful, tactical, egregious and inexcusable. [Defendant's] conduct prevented [plaintiff] from preparing for trial since the documents were necessary to [his] objective of showing misappropriation and commingling of funds. The court, over the course of the year, progressively sanctioned [defendant]. Still, [defendant] did not produce the requested documents. [¶] The trial court and the referee conducted many hearings and afforded [defendant] numerous opportunities to comply with the orders." (*Id.* at p. 1247.) On that procedural background, the court upheld the trial court's ruling.

Our review of the administrative record convinces us that the hearing officer did not abuse his discretion in terminating the hearing. Dr. Mileikowsky was repeatedly sanctioned, repeatedly warned, and repeatedly importuned to treat the hearing officer and the hearing process with respect. By the time the hearing officer imposed the terminating sanction, less severe sanctions had already been tried with respect to discovery and exhibits. They obviously had little impact, as Dr. Mileikowsky neither produced the documents nor prepared his exhibits or exhibit list. Despite the ineffectuality of prior sanction orders, the hearing officer initially hoped to impose lesser sanctions to deal with the disruptive conduct at the hearing sessions. But Dr. Mileikowsky threatened to defy the ruling if sessions were reconvened. The hearing officer could not disregard Dr. Mileikowsky's disdain for his authority forever. Nor could he permit Dr. Mileikowsky to continue to unnecessarily prolong the proceedings. The Hospital was entitled to closure, and the Hearing Committee members were entitled to get on with their lives. The decision to terminate the hearing was justified under the circumstances.

## IV

### *Substantive Issues*

Dr. Mileikowsky and amicus curiae Association devote considerable portions of their briefs to the contention that the summary suspension was unwarranted. Amicus curiae Consumer Attorneys expresses concern that Dr. Mileikowsky's staff membership was withdrawn in retaliation for his agreement to testify in a medical malpractice action. We are not called on here to review the merits of the decision to suspend Dr. Mileikowsky's hospital privileges or the decision to refuse his request for reappointment. The sole issue presented is whether the hearing officer's ruling, upheld by the appellate review body, terminating the administrative proceeding based on Dr. Mileikowsky having waived his rights to proceed by his behavior was correct or whether instead Dr. Mileikowsky's due process rights were violated by premature adjournment of the hearing.

A similar debate arose in *Bollengier v. Doctors Medical Center* (1990) 222 Cal.App.3d 1115 [272 Cal.Rptr. 273], where the physician claimed that the charges against him were procedurally invalid. When the hearing officer refused to dismiss the charges, he sought a writ of mandate from the superior court, arguing he should not be required to stand trial on charges which were procedurally defective. On appeal from the order denying the petition based on failure to exhaust administrative remedies, the parties presented "extensive arguments regarding the facts surrounding the suspension" and provided "conflicting evidence to support their respective positions." (*Id.* at p. 1122.) The physician presented evidence of "his outstanding surgical skill and 'legendary' patient care" and alleged that the suspension was "economically motivated." (*Ibid.*) The hospital set forth evidence of " 'gross misconduct' " and argued that summary suspension was "necessary to protect patients and others from [the physician]." (*Ibid.*) The Court of Appeal refused to take the bait, limiting itself to the procedural issue presented: "Factual findings have not yet been made in this case and, as is evident from the arguments, many of the facts are hotly contested. This court cannot make the required factual determinations. . . . Thus, all of the discussion and exhibits regarding the disputed facts are irrelevant to the issues before us." (*Id.* at pp. 1122–1123.)

Turning to the procedural issues, the court held that the trial court had correctly ruled that the physician failed to exhaust his administrative remedies. The physician contended that administrative remedies were inadequate "because there is no mechanism for an interim review of the claimed procedural deficiencies." (*Bollengier, supra*, 222 Cal.App.3d at p. 1129.) The court concluded that the lack of opportunity for interim review did not render the administrative process meaningless: "The fact petitioner is facing numerous charges of misconduct and claims procedural irregularities took place, does not warrant court intervention before the administrative proceedings are concluded." (*Ibid.*) Moreover, to the extent the physician contended that summary suspension was invalid because need for immediate action was not present and the suspension was done in bad faith, these were factual challenges that required resolution of disputed facts. (*Id.* at p. 1131.)

Dr. Mileikowsky and amicus curiae Association raise arguments that echo those in *Bollengier*, contending that the Hospital's summary suspension decision was taken in bad faith and in the absence of evidence of imminent harm. These were the issues being litigated before the Hearing Committee. Dr. Mileikowsky's actions caused the hearing to be terminated and prevented the Hearing Committee from issuing a decision on the merits. As a result, like the court in *Bollengier*, we do not reach the substantive issues.

## DISPOSITION

The judgment is affirmed.

Hastings, Acting P. J., and Grimes, J.,* concurred.

A petition for a rehearing was denied May 4, 2005, and appellant's petition for review by the Supreme Court was denied August 17, 2005. Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.